*102
 
 WOODALL, Justice.
 

 Macon County Greyhound Park, Inc., d/b/a Victoryland (“Victoryland”), appeals from a summary judgment for Sherry Knowles in the amount of $10,000,000 in Knowles’s action alleging that Victoryland breached a contract to pay her a $41,800,000 bingo “jackpot.” We reverse and remand.
 

 I. Factual and Procedural Background
 

 This case arises out of Ala. Const.1901, Amend. No. 744 (Local Amendments, Macon County, § 1, Ala. Const. 1901 (Off.Re-comp.)), which authorizes “[t]he operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes ... in Macon County.” Amendment No. 744 further authorizes the sheriff of Macon County to “promulgate rules and regulations for the licensing and operation of bingo games within the county.” In force at all times relevant to this action were the “Second Amended and Restated Bingo Regulations for the Licensing and Operation of Bingo Games in Macon County” (“the sheriffs regulations”), promulgated by the Macon County sheriff pursuant to Amendment No. 744.
 

 The stated purpose of the sheriffs regulations is to “adopt the policy of the Attorney General in limiting the conduct of Class B bingo gaming in Macon County thereby allowing the Sheriff to more effectively regulate and enforce the proper conduct of bingo games.” The sheriffs regulations comprise 12 pages of text, which are divided into the following 18 sections: (1) “Definitions”; (2) “Operation of Bingo Games in Macon County”; (3) “Bingo License Required”; (4) “Application for License; Submission; Form; Contents”; (5) “Issuance of License”; (6) “Amendments; Applications; Licenses”; (7) “Contents and Display of Licenses”; (8) “Fee Proceeds”; (9) “General Regulations; Prizes”; (10) “Records and Accounting”; (11) “Enforcement and Supervision; Rules; Bonds”; (12) “Revocation of Licenses; Appeal”; (13) “Effect of Revocation”; (14) “Appeal of Denial of License”; (15) “Compliance with Federal Law”; (16) “Sever-ability”; (17) “Amendments”; and (18) “Effective Date.”
 

 “Bingo” is defined in § 1 as
 

 “any game of chance known as bingo, including any bingo game permitted by federal law, (whether or not electronic, computer, or other technologic aids are used in connection therewith) which is played for prizes, with cards bearing numbers or other designations, and [in] which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards. The bingo game must incorporate the typical features of traditional bingo, including, but not limited to, a grid of five horizontal and five vertical squares, numbers randomly selected, and a preordained winning pattern. Alternative entertaining displays such as spinning reels and other video or mechanical graphics are permitted but must not affect game play. Just as in traditional bingo halls, players on electronic bingo machines must compete against one another. Consequently, the electronic machines must be linked so that players are competing against each other. Nothing herein is intended to prohibit the award of interim or consolation prizes. Electronic, computer or other technologic aids include any machine or device that assists a player or the playing of a bingo game; broadens the participation levels in a common game; facilitates communication be
 
 *103
 
 tween and among bingo locations; or allows players to play a game with or against other players rather than with or against a machine. Examples of electronic, computer or other technologic aids include, but are not limited to, dispensers, readers, electronic player stations, electronic cards for participants in bingo games, player terminals, central servers containing random number generators for remote player terminals and video displays providing game results in different display modes.”
 

 Section 9, “General Regulations; Prizes,” states:
 

 “(a) No person under the age of 19 years shall be permittéd to play any game or games of bingo, nor shall any person under the age of 19 years be permitted to conduct or assist in the operation of any game of bingo.
 

 “(b) No bingo license shall be issued to any nonprofit organization unless the organization shall have been in existence for at least three (3) years in the county immediately prior to the issuance of the permit or license.
 

 “(c) Bingo games may be operated on the premises owned or leased by the nonprofit organization operating the bingo games.
 

 “(d) A nonprofit organization may enter into a contract with ány individual, firm, association or corporation to have the individual or entity operate bingo games or concessions on behalf of the nonprofit organization. A nonprofit organization may pay consulting fees to any individual or entity for any services performed in relation to the operation or conduct of a bingo game.
 

 “(e) A nonprofit organization may lend its name or allow its identity to be used by another person or entity in the operating or advertising of a bingo game in which the nonprofit • organization is not directly and solely operating the bingo game.
 

 “(f) Prizes given by any nonprofit organization for the playing of bingo games shall not exceed the cash amount or gifts of equivalent value set by these Rules and Regulations for any bingo session. For the purposes of these Rules and Regulations, no single prize given by any nonprofit organization, or on its behalf, for the playing of bingo games shall exceed $20,000,000 in cash or equivalent value during any bingo session.
 

 “(g) No person who has been convicted of a felony offense, and whose civil rights have not been restored by law, shall conduct or in any way participate in the operation of any bingo game permitted hereunder, nor shall any person who has been convicted of any gambling offense be permitted to conduct or in any way partieipaté in the operation of any bingo game permitted hereunder within 12 months of the conviction.”
 

 Section 11, “Enforcement and Supervision; Rules; Bonds,” states:
 

 “(a) The Sheriff shall be charged with the duty to and shall enforce and supervise the administration and enforcement of all of the rules, regulations and reporting required-hereunder. In addition to these regulations, the Sheriff shall enforce all applicable criminal and civil laws of the State of Alabama to prevent and discourage any illegal activity.
 

 “(b) The Sheriff may require such acceptable sureties and/or bonds which he deems reasonable or necessary to insure [sic] proper compliance with these Rules and Regulations and the submission of such acceptable sureties or bonds shall be a condition precedent to the issuance of any license hereunder. The operator and surety or sureties shall be jointly and severally responsible for payment of
 
 *104
 
 prizes to winners, said payment to occur no later than the end of the session during with the prize was won.”
 

 Pursuant to authorization by the Macon County sheriff, Victoryland conducts bingo games in Macon County on behalf of 60 nonprofit organizations in Macon County. Knowles describes the game involved in this appeal as “bingo [that] is played electronically with slot machine devices whereby the bingo card appears on a video screen displayed on the electronic slot machine.”
 
 For purposes of this appeal only, we accept
 
 this general description, as well as the following descriptions of the operation of the electronic machines.
 

 Knowles sued Victoryland and Multimedia Games, Inc. (“Multimedia”), alleging that, on May 2, 2006, while she was playing bingo at Victoryland on a machine manufactured by Multimedia, she “hit a jackpot of $41,800,000,” which Victoryland and Multimedia refused to pay. She sought $41,800,000 in compensatory damages for breach of a “contract to pay jackpot winnings.” The machine on which Knowles was playing when she won the alleged “jackpot” worked in the following manner.
 

 A.
 
 The Machine
 

 A prospective player may begin play by becoming a member of the Quincy’s Triple 7 Players Club (“Q-Club”) and purchasing an electronic-bingo credit card (“the Q-card”). The Q-card contains credits that can be acquired by inserting it and money into an electronic-bingo machine. A player joins a game by inserting the Q-card and playing the simulated, 5-line bingo card that appears on the video screen.
 

 ■ On the bottom left of the video screen is an icon labeled “HELP PAYTABLE.” This icon provides access to two “help” screens containing instructions for playing the game. Those instructions are as follows: •
 

 “•ADD CREDITS TO PLAY
 

 “Insert player card to start session (see cashier for player card).
 

 “•PRESS ‘DISPLAY’ FOR LARGE BINGO CARD
 

 “• TOUCH SMALL BINGO CARD TO CHANGE CARD NUMBERS
 

 “• SELECT NUMBER OF CREDITS TO WAGER
 

 “See following pages for details.
 

 “• PRESS ‘PLAY’ TO START
 

 “ ‘PLAY’ joins a multiplayer bingo game.
 

 ‘PLAY’ will also rebet and join game. Insufficient number of players refunds bet.
 

 “•PRESS ‘CLAIM’ TO DAUB CARD AND CLAIM PRIZE
 

 “Prizes are awarded for balls drawn to the game-ending TRIANGLE pattern or for the first 30 balls (whichever is fewer).
 

 “•REMOVE PLAYER CARD TO END SESSION
 

 “Remaining credits (or partial credits) will be applied to player card account.
 

 “•SELECT THE NUMBER OF CREDITS TO WAGER
 

 “Play 1 credit on each of 1 to 5 pay-lines at a time. Press ‘BET ONE’ to activate the 1st payline. Press ‘BET ONE’ again to increase wager by 1 credit & payline. Press ‘MAX BET’ to activate all 5 paylines and start game.
 

 “•
 
 WIN JACKPOT OF 10,000 CREDITS
 

 “Covering the LETTER K bingo pattern with max credits bet results in three Double Jackpot symbols on the fifth payline and wins the jackpot.
 

 “• SELECT GAME DENOMINATION
 

 
 *105
 
 “If multi-denom is enabled, change credit value between plays by touching denomination
 

 “• PRESS ‘DAUB GENIUS’ TO TURN ON THE AUTOMATIC DAUB & CLAIM FEATURE
 

 “Turning on the Daub Genius [feature] automatically daubs and claims until deactivated or session ends. Turn off the Daub Genius by pressing [the Daub Genius icon] again.”
 

 (Emphasis added.) The first help screen contains three meters: (1) a “paid” meter, (2) a “credits” meter, and (3) a “bet in” meter. These three meters also appear on the face of the video screen during play.
 

 At the bottom right of the second “help” screen is a “PAYTABLE” icon. Pressing the PAYTABLE icon accesses 15 screens containing 259 possible bingo-card patterns. Each pattern is associated with a specific credit value. The credits range from a high of 10,020 credits for the “LETTER K bingo pattern,” to a low of 2 credits for certain patterns, including a “snake-eyes” configuration.
 

 As the “help” screens indicate, betting involves the interplay of money and credits, and prizes are won in credits. Bets are made at a rate of 25$, 50<f, or $1 per line on the simulated bingo card. The credits won are subsequently converted into money at a rate of 25$ per credit, 50$ per credit, or $1 per credit, depending on the denomination the player has chosen to bet. For example, the monetary value of the 10,020 credit jackpot ranges from $10,020 (for a $1 bet) to $2,505 (for a 25$ bet).
 

 Five winning “LETTER R bingo patterns” are possible, each having its own payoff value. Such a pattern on the first two credits/paylines pays 2,000 credits. That same pattern on the second two credits/paylines pays 2,002 credits. The “LETTER K” pattern on the-fifth credit/payline, that is, with the “maximum credits bet,” pays 10,020 credits.
 

 These payouts are essentially represented on the “awards glass” or “upper cabinet” situated on the face of the electronic-bingo machine above the video screen. In the center of the awards glass appear the words: “PAYS ON LIT LINES.” Above these words is a diagram indicating that the payout for the “1ST CREDIT” is “2000”; payout for the “2ND CREDIT” is “2000”; payout for the “3RD CREDIT” is “2000”; payout for the “4TH CREDIT” is “2000”; and payout for the “5TH CREDIT” is “10,000.” When a player wins a jackpot, the following message appears on the video screen: “YOU’RE A WINNER [$_] PLEASE WAIT FOR AN ATTENDANT.”
 

 Only the jackpot pattern ends the game. However, all machines at Victoryland are programmed to “lock up” when the player wins any prize of $1,200 or more. When such a lockup occurs, the player is escorted to the “cash cage,” where the player is required to complete the tax documents required by the Internal Revenue Service for winnings of $1,200 or more. No further transactions are possible on that bingo machine until one of Victoryland’s “gaming directors” unlocks the machine by inserting his or her own card. The rules outlined in this Part I.A. shall be referred to as the “rules of the wager.”
 

 B. The Incident Involving Knowles
 

 In 2006, Knowles was employed as a secretary in the Victoryland police department. She and her husband frequently played electronic-bingo and slot machines throughout the Southeast. As early as 2003, she was winning prizes on the electronic-bingo machines at Victoryland.
 

 On May 2, 2006, she was playing bingo on one such machine. In an affidavit, she stated:
 

 
 *106
 
 “On the night in question, I played several different bingo games on different bingo machines. However, I ultimately began playing on machine number . Y2H01-11462. After playing on that machine for a period of time, I placed a one dollar ($1.00) bet per line and hit the play button. Thereafter, the bingo lights that are displayed on the machine lit up to indicate a winning play. Additionally, the credits in the
 
 credit
 
 [meter] began to accumulate.”
 

 (Emphasis added.) In other words, Knowles avers that she placed a wager and won a prize. For. the purposes of this opinion, we will assume, without deciding, that she placed a wager.
 

 As one or more of Vietoryland’s employees watched, the number of credits in the credit meter climbed to 40,000,000 credits and beyond. One employee was James Graham, a “gaming manager” for Victory-land. Graham noticed not only the number on the credit meter, but also the pattern displayed on the bingo card Knowles was playing. The pattern was “snake eyes.” According to Knowles, one of the employees “announced that the play was not a valid win,” removed Knowles’s Q-card, inserted his own card, and “cleared the board in such a fashion that all credits were deleted from the meter.” She alleges that the last time anyone looked at the credit meter, it read 41,800,000 credits and was still climbing. Knowles continued to play that same machine for some time after the incident. Indeed, a few minutes later, she won a $2,505 jackpot on the machine for which she was duly paid.
 

 Subsequently, however, she sued Victo-ryland and Multimedia. On August 10, 2007, Knowles voluntarily dismissed Multimedia from the case. Later, she filed a motion for a partial summary judgment on her claim against Victoryland. On June 16, 2008, the trial court entered a partial summary judgment in favor of Knowles on the issue of liability. In so doing, it concluded (1) that there was a contract between Knowles and Victoryland, the terms of which consisted solely of the
 
 sheriffs regulations,
 
 and (2) that she had won a jackpot of at least 40,000,000 credits. The trial court concluded - that triable factual issues remained as to damages, including disputes as to the amount of money Knowles had bet per credit and the “total amount she [had] won in excess of 40,000,-000 credits.”
 

 After a jury was empaneled to try the case, Knowles orally moved the trial court for a summary judgment on the issue of damages. In so doing, she limited her claim to 40,000,000 credits at a rate of 25$ per credit. She also moved to amend her complaint to seek no more than $10,000,000. In an amended order, the trial court granted these motions and entered a summary judgment for Knowles, awarding her $10,000,000.
 

 The trial court subsequently denied Vic-toryland’s motion to alter, amend, or vacate the judgment, and Victoryland appealed. On appeal, Victoryland contends, among other things, (1) that the trial court misapplied ordinary principles of gambling-contract law and (2) that Knowles has not met her burden of production to show that a contract existed for the payment of $10,000,000.
 

 II. Discussion
 

 This case presents two dispositive issues. The first issue is a legal one, namely, whether contracts between Victo-ryland and its patrons involving the operation of electronic-bingo machines consist solely of the provisions set forth in the sheriffs regulations. The issue might otherwise be stated as whether the terms of the gambling contract at issue in this case necessarily include the rules of the wager. The second issue is a factual one involving
 
 *107
 
 whether Knowles has met her burden of production to show that she is entitled to a summary judgment on her claim that she won, at the very least, a $10,000,000 prize.
 

 A. Rules of the Wager
 

 The trial court stated:
 

 “[Victoryland] has argued that the contract, if any, between it and [Knowles], is a ‘gaming contract’ that is comprised of terms and conditions contained on the bingo machine, within the bingo machine and posted at its bingo facility. While the court finds legal authority to support Knowles’s contention that the [the sheriffs regulations] support the formation and existence of a contract between her and [Victoryland], the court finds no legal authority
 
 from Alabama
 
 for [Victoryland’s] proposition that a ‘gaming contract’ is formed by the machine, with the machine or at the machine between the player and the bingo operator.”
 

 (Emphasis added.)
 

 We agree with these observations in one respect: Alabama courts have had few opportunities to address an issue such as the one here presented. This is so, because of the constitutional and statutory impediments in Alabama to the enforcement of gambling contracts. See Ala. Const.1901, § 65 (prohibiting the legislature' from “authoriz[ing] lotteries or gift enterprises for any purposes”); Ala.Code 1975, § 8-1-150(a) (“All contracts founded in whole or in part on a gambling consideration are void.”). Because the
 
 parties agree
 
 that Amendment No. 744 removes impediments to the enforceability of this contract,
 
 [1]
 
 we are presented with the opportunity to join
 
 other states
 
 in addressing the role of rules of the wager in the formation of a gambling contract.
 

 A gambling contract has been defined as:
 

 “A contract by which two or more parties agree that a
 
 certain sum of money
 
 or other thing shall be paid or delivered to one of them or that they shall gain or lose on the happening of an
 
 uncertain event
 
 ..., where the parties have no interest in the event except that arising from the possibility of such gain or loss.”
 

 Black’s Law Dictionary
 
 1579 (6th ed.1990) (emphasis added) (hereinafter
 
 “Black’s”).
 

 It is widely recognized that the formation of a gambling contract requires
 
 all the formalities
 
 of contract formation generally, including “ ‘ “an offer and an acceptance, consideration, and mutual assent to
 
 terms essential to the formation of a contract’”” Avis Rent A Car Sys., Inc. v. Heilman,
 
 876 So.2d 1111, 1118 (Ala.2003) (quoting
 
 Ex parte Grant,
 
 711 So.2d 464, 465 (Ala.1997), quoting in turn
 
 Strength v. Alabama Dep’t of Fin., Div. of Risk Mgmt.,
 
 622 So.2d 1283, 1289 (Ala.1993) (emphasis added)). See Anthony Cabot & Robert Hannum,
 
 Advantage Play and Commercial Casinos,
 
 74 Miss. L.J. 681, 722 (2005)(hereinafter
 
 “Gaming Law
 
 ”) (“Because gambling is a contract, the general elements of a contract must exist before there is a binding agreement.”); Griggs Smith & Jason Nabors,
 
 Beating the House,
 
 40 Trial 42, 42 (June 2004) (“Jackpot disputes involve contract law. Gambling necessarily involves a contractual agreement, which includes offer, acceptance, and consideration.”).
 

 To be sure, the law in Alabama and elsewhere is that “ ‘the law enters into and defines the obligation .of every contract’ and that ‘[a]ll men are charged as [a] matter of public policy with a knowledge of the law pertaining to their transactions.’ ”
 
 *108
 

 Barber Pure Milk Co. of Montgomery, Inc. v. Alabama State Milk Control Bd.,
 
 275 Ala. 489, 494, 156 So.2d 351, 855 (1963) (quoting
 
 Birmingham Bar Ass’n v. Phillips & Marsh,
 
 239 Ala. 650, 656, 196 So. 725, 731 (1940)). Otherwise stated, “ ‘every contract is made with reference to existing law and every law affecting the contract is read into and becomes a part of the contract when made.’ ”
 
 Id.
 
 (quoting
 
 Bush v. Greer,
 
 235 Ala. 56, 58, 177 So. 341, 341 (1937)). Indeed, “the law
 
 can
 
 dictate mandatory terms of a contract between a casino and a patron, such as requiring that the casino must pay out a minimum average return on wagers ... or actually
 
 dictating the exact terms of the contract by statutorily setting the rules on how the games must be played.” Gaming Law,
 
 74 Miss. L.J. at 726 (emphasis added).
 

 However, any contract must express all terms essential to the transaction with definiteness sufficient to enable a court to enforce the parties’ agreement.
 
 White Sands Group, L.L.C. v. PRS II, LLC,
 
 998 So.2d 1042, 1051 (Ala.2008). “ ‘[A] contract that “ ‘leav[es] material portions open for future agreement is nugatory and void for indefiniteness.’ ” ’ ”
 
 Id.
 
 (quoting
 
 Miller v. Rose,
 
 138 N.C.App. 582, 587-88, 532 S.E.2d 228, 232 (2000), quoting in turn
 
 MCB Ltd. v. McGowan,
 
 86 N.C.App. 607, 609, 359 S.E.2d 50, 51 (1987)). “ ‘Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.’ ”
 
 Id.
 
 (quoting 17A Am.Jur.2d
 
 Contracts
 
 § 183 (2004)). Indefiniteness may “render[] a contract void for lack of mutuality” of obligation.
 
 Beraha v. Baxter Health Care Corp.,
 
 956 F.2d 1436, 1440 (7th Cir.1992).
 

 It is Victoryland’s position that, if, as the trial court held, the sheriffs regulations “constitute the exclusive terms of [Knowles’s alleged] contract,” then there would be “no contract to be' breached.” Victoryland’s reply brief, at 11. This is so, according to Vietoryland, because such a “contract” would lack essential terms, such as “the bet amount, a winning pattern description, or a prize amount (even the credit meter [on] which [Knowles] relies is found on the machine’s video screens).” Victoryland’s brief, at 34. In other words, it argues, the rules of the wager provide the terms necessary to form an enforceable contract between Vietoryland and its patrons. We agree with this position.
 

 The sheriffs regulations are far too generic to provide the basis for any enforceable contractual relationship. Even a cursory reading of the excerpts set out in Part I of this opinion reveals that the sheriffs regulations deal primarily with such general topics as definitions, licensing and application procedures, accounting practices, and enforcement. To the extent they
 
 are
 
 more specifically tailored to individual transactions, they expressly contemplate that the players’ contracts
 
 will
 
 incorporate the casino’s rules of the wager.
 

 For example, § 1 of the sheriffs regulations, which defines certain features that must be incorporated into the bingo game, states that games must be “won by the first person covering a
 
 previously designated arrangement of numbers
 
 or designations on such [bingo] cards.” One searches the sheriffs regulations in vain for such “designated arrangement[s] of numbers.” Thus, those arrangements must be ones designated by the casino as part of the rules of the wager. Similarly, § 1 requires prizes to be awarded according to a “preordained winning pattern.” Because the sheriffs regulations do not provide any winning patterns, they necessarily contemplate that such patterns must also be provided by the casino as a part of the rules of the wager. Section 1 further
 
 *109
 
 provides that the casino may, but need not, provide for “interim or consolation prizes” in addition to jackpot prizes.
 

 According to Knowles’s theory of the case, whenever a patron “insert[s] the Q-card; accept[s] or select[s] a bingo card; placets] a bet of a particular denomination; and then hit[s] the play buttonf;] ‘Bingo!,’ the contract is formed.” Knowles’s brief, at 39. Paradoxically, Knowles concedes that she took these steps by following the “straight-forward
 
 instructions on the [video screen],”
 
 and that Victoryland’s “
 
 ‘offer’
 
 ...
 
 was comprised of
 
 the rules promulgated by the sheriff of Macon County
 
 and the rules Victoryland posted on the face of the
 
 ...
 
 machine.”
 
 Knowles’s brief, at 38-39 (emphasis added). These instructions, of course, are not in the sheriffs regulations. Thus, Knowles admits that her contract was based — at least in part — on the rules of the wager.
 

 Indeed, the trial court’s judgment is based on the fact that the appearance on Knowles’s video screen of one of the “winning patterns” coincided with the advancing credits on the credit meter. Specifically, the partial summary judgment as to liability stated, in pertinent part:
 

 “Knowles contends she placed a [25<f] bet per line and hit the play button.... After hitting the play button, the bingo machine displayed a bingo card on a video screen, that is built into the electronic device. According to Knowles, the bingo card exhibited a ‘winning play.’ Knowles’s affidavit is supported by the testimony of James Graham, a gaming manager for [Victoryland].... Graham arrived at the electronic machine played by Knowles and viewed a bingo card that
 
 exhibited a ‘snake eyes’ pattern.
 
 When questioned by counsel for Knowles as to whether this pattern was a winning pattern or not, he stated:
 

 “Q. ‘Was it a winning pattern?’
 

 “A.
 
 ‘Snakes eyes is a winning pattern.’
 

 “(Graham Depo. Vol. II, p. 217.) Graham observed that the credit meter on the machine played by Knowles was at ‘... roughly 40,000,000 credits’ when he last saw it. (Graham Depo. Vol. II, p. 217.) According to Knowles, the credit meter was at approximately 41,800,000 when she last observed it.
 

 [[Image here]]
 

 “... The undisputed evidence establishes that Knowles had inserted money into the machine prior to the event she [and] Graham ... observed. A winning bingo card then appeared on the machine. This card displayed a ‘snake eyes pattern.’
 

 [[Image here]]
 

 “Knowles has made a prima facie showing that she is entitled to relief on her contract claim. [Victoryland] has failed to produce substantial evidence that disputes her contract claim, with the exception of the amount to which she is entitled.... There is no genuine issue of material fact that she has suffered damages when she was not paid her jackpot on May 2, 2006. There is disputed evidence as to exactly how much she won which precludes granting summary judgment in a specific amount.”
 

 (Emphasis added.)
 

 In this reasoning, the trial court clearly erred. There is nothing in the
 
 sheriffs regulations
 
 about “snake-eyes.” That term, like other necessary terms of the contract, are supplied, not by the sheriffs regulations, but by the rules of the wager. The very essence of the gambling contract in this case must be a mutual understanding as to (1) what “certain sum of money” will “be paid” to one of the parties, and (2) what “uncertain event” triggers the payoff.
 
 Black’s,
 
 at 1579. Simply stated, without
 
 *110
 
 the rules of the wager, there would be no contract and, therefore, no basis for the judgment awarded in this case.
 

 Not surprisingly, the general rule is that “[cjasino-style wagering is essentially an
 
 adhesion
 
 contract between the casino and its patrons,” that is,
 
 “the casino
 
 defines the terms, of the contract (the rules of the wager) and allows patrons to play the game as-is, with
 
 no possibility of changing the rules.” Gaming Law,
 
 74 Miss. L.J. at 722 (emphasis added). See, e.g.,
 
 Eash v. Imperial Palace of Mississippi, LLC,
 
 4 So.3d 1042, 1048 (Miss.2009) (rules of the wager posted on a slot machine were the terms of the contract, which restricted a patron’s prize to the posted game limit of $8,000, “despite [a] regrettable programming error that led [patron] to bélieve that she had won $1,000,000”);
 
 Sengel v. IGT,
 
 116 Nev. 565, 571-72, 2 P.3d 258, 262 (2000) (pattern of symbols on the “pay table [of a slot machine] was an express term of the wagering contract entered into between the parties”).
 

 “The nature of gaming necessitates such adhesion contracts. Casinos are in the business of making money. Therefore, the casino typically only enters into contracts that have a statistical advantage favoring the casino. Altering the terms of this contract could change the statistical advantage, such, as by changing the probability of winning or losing the wager.”
 

 Gaming Law,
 
 74 Miss. L.J. at 722.
 

 To allow casino patrons to ignore the rules of the. wager, as Knowles proposes we do, would effectively allow the patrons to play the casino’s machines according to
 
 their own ad hoc
 
 rules. Such a result would defy common sense and would turn the relationship between the casino and the patron on its head. Thus, we hold that the terms that were necessary and indispensable to the formation of an enforceable contract between Victoryland and Knowles were the rules of the wager incorporated into the help screens and pay tables of machine no. Y2H01-11462.
 

 Puzzlingly, Knowles, an experienced gambler, further objects to the application of the rules of the wager on the ground that they were
 
 unknown to her,
 
 and that they could be accessed only by pressing the “HELP PAYTABLE” icon. In this connection, she says that the “wagering contract offer [Victoryland] made to Ms. Knowles was that appearing on the
 
 face
 
 of the machine,” that is, to the exclusion of everything included in the “help” screens and the “paytable” screens. Knowles’s brief, at 11 (emphasis added). For that proposition, she relies on
 
 Southern Energy Homes, Inc. v. Hennis,
 
 776 So.2d 105 (Ala.2000).
 
 Hennis,
 
 however, is inapposite.
 

 The dispute in
 
 Hennis
 
 began when William D. Hennis purchased a manufactured
 
 home from
 
 Jack Lee Mobile Homes (“Jack Lee”). 776 So.2d at 106. The home was manufactured by Southern Energy Homes, Inc. (“Southern Energy”). Hennis’s only contacts with Southern Energy were the home itself and his receipt at the time of purchase of a “‘[Homeowner’s] Manual from Southern [Energy].’ ”
 
 Id.
 
 The manual contained an arbitration clause and an express . warranty. Following the purchase, Hennis “ ‘became dissatisfied with the home and filed suit [against Southern Energy] for, among other things, breach of warranty containing the arbitration agreement.’”
 
 Id.
 
 (quoting Southern Energy’s brief, at xiii). Hennis did not sign the pages of the homeowner’s manual containing the arbitration clause, and there was no evidence indicating that Hennis had ever sought repairs under the warranty. Thus, aside from the breach-of-warranty claim itself, there was no evidence indicating that Hennis had ever “assented to the terms in the Homeowner’s Manual, includ
 
 *111
 
 ing the warranty and the arbitration provisions.” 776 So.2d at 109.
 

 This Court affirmed the trial court’s order denying Southern Energy’s motion to compel arbitration. It held that “the manufacturer’s unilateral enclosure of an arbitration provision in a homeowner’s manual is — without more — insufficient
 
 as a matter of law
 
 to show that the buyer assented to all the contents therein.” 776 So.2d at 108-09.
 

 Actually, Knowles should find little solace in
 
 Hennis.
 
 Although we refused to overturn the trial court’s order denying arbitration, we regarded the “provisions contained in such a homeowner’s manual [as] immaterial, ‘except in the
 
 utterly collateral sense
 
 that if the plaintiffs had never purchased their mobile homes,’ ... they would not have received the homeowner’s manual.” 776 So.2d at 109 (quoting
 
 Ex parte Isbell,
 
 708 So.2d 571, 578 (Ala.1997) (emphasis added)). There is a distinct difference between provisions collateral to a consumer contract for the purchase of a mobile home, as in
 
 Hennis,
 
 and the
 
 gambling contract
 
 involved in this case. In
 
 Hennis,
 
 the
 
 essential
 
 terms of the purchase contract — about which there was no dispute — were the subject matter (the manufactured home), the price, the time of delivery, the place of delivery, etc. In this case, the essential terms — which Knowles would have this Court reject — include the amount at stake and the circumstances of the payoff. Patrons at Victoryland bet on the appearance of specific patterns and the attendant credits. Those terms are not in any sense “collateral” to Knowles’s gambling contract — they
 
 are
 
 the contract.
 

 Also,
 
 Hennis
 
 is unavailing to Knowles, because in
 
 Hennis
 
 we said: “We hasten to point out that, under the recent precedent of this Court, Hennis may not pursue his breach-of-express-warranty claim against Southern Energy. This is so because he cannot rely on the express written warranty and, at the same time, disavow the arbitration provision contained therein.” 776 So.2d at 109.
 

 It is elementary that one cannot at once repudiate and enforce a contract.
 
 Dezsofi v. Jacoby,
 
 178 Misc. 851, 853, 36 N.Y.S.2d 672, 674 (N.Y.Sup.1942);
 
 O.K. Transfer & Storage Co. v. Neill,
 
 59 Okla. 291, 159 P. 272, 274 (1916). See also
 
 Credit Sales, Inc. v. Crimm,
 
 815 So.2d 540, 546 (Ala. 2001) (noting that a'party “cannot pick and choose which contract provisions she wishes to have benefit her and reject those she does not wish to have bind her; instead, she must accept or reject the entire contract”). Ultimately, Knowles must choose whether to proceed on her claim with a contract based on the rules of the wager or to abandon her breach-of-contract claim altogether.
 
 Hennis,
 
 776 So.2d at 109. She cannot repudiate the very contract she seeks to enforce. Thus, the only remaining question is whether she has met her burden to show that thé rules of the wager entitle her to a $10,000,000 prize.
 

 B. Knowles’s Burden of Production
 

 “ ‘ “ ‘[T]he manner in which the [summary-judgment] movant’s burden of production is met depends upon which party has the burden of proof ... at trial.’ ”
 
 Ex parte General Motors Corp.,
 
 769 So.2d 903, 909 (Ala.1999) (quoting
 
 Berner v. Caldwell,
 
 543 So.2d 686, 691 (Ala.1989) (Houston, J., concurring specially)). If ... “ ‘the movant has the burden of proof at trial, the movant must support his motion with credible evidence, using any of the material specified in Rule 56(c), [Ala.] R. Civ. P. (“pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits”).’ ” 769 So.2d at 909. “ ‘The movant’s proof must be such that he would be entitled to a di
 
 *112
 
 rected verdict [now referred to as a judgment as a matter of law, see Rule 50, Ala. R. Civ. P.] if this evidence was not controverted at trial.’ ”
 
 Id.
 
 In other words, “when the movant has the burden [of proof at trial], its
 
 own submissions
 
 in support of the motion must entitle it to judgment as a matter of law.”
 
 Albee Tomato, Inc. v. A.B. Shalom Produce Corp.,
 
 155 F.3d 612, 618 (2d Cir.1998) (emphasis added). See also
 
 Equal Employment Opportunity Comm’n v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico,
 
 279 F.3d 49 (1st Cir.2002);
 
 Rushing v. Kansas City Southern Ry.,
 
 185 F.3d 496 (5th Cir.1999);
 
 Fontenot v. Upjohn Co.,
 
 780 F.2d 1190 (5th Cir.1986);
 
 Calderone v. United States,
 
 799 F.2d 254 (6th Cir.1986).’”
 

 Jones-Lowe Co. v. Southern Land & Exploration Co.,
 
 18 So.3d 362, 367 (Ala.2009) (quoting
 
 Denmark v. Mercantile Stores Co.,
 
 844 So.2d 1189, 1195 (Ala.2002)).
 

 As discussed in the previous part of this opinion, the trial court based its award of $10,000,000 on the fact that the roll-up of the credit meter coincided with the appearance of a “snake-eyes” pattern on the video screen of the electronic-bingo machine Knowles was playing. According to Victoryland, however, there is a genuine issue of materiál fact as to the significance, if any, of such a coincidence. We agree.
 

 In its “answers to [Knowles’s] second consolidated interrogatories,” Multimedia stated that it was the
 
 paid
 
 meter, not the credit meter, that displayed a patron’s winnings.
 
 [2]
 
 James Graham, a “gaming manager” for Victoryland, testified by deposition that
 
 no pattern on the machine
 
 paid 40,-000,000 credits, the amount that allegedly appeared on the credit meter of Knowles’s machine on May 2, 2006. Similarly, Stanley Hubbard, a “gaming director” for Vic-toryland, testified by affidavit that the credit meter on Knowles’s machine “was rolling up far in excess of the credits which [could] be won on that machine.” The highest winning pattern in the paytable yielded no more than 10,020 credits. In fact, the highest number of credits appearing on the
 
 face
 
 of the machine was 10,000.
 

 Chris Fogarty, a “floor supervisor” for Victoryland, testified by affidavit that the bingo card appearing on the video screen of Knowles’s machine did not display a “jackpot pattern.” Indeed, it is undisputed that the pattern displayed was “snake-eyes.” In that connection, Graham stated in his deposition that the payout for a “snake-eyes” pattern was only
 
 two credits.
 
 This testimony was supported by the patterns' in the paytable, which attributed only two credits to a “snake-eyes” pattern.
 

 There was, in other words, substantial evidence indicating that Knowles’s prize was worth only two credits, regardless of what the credit meter registered. As Vic-toryland correctly stated: “This evidence created a genuine issue of material fact as to what prize Knowles • was entitled to win — two credits or 40..million credits.” Victoryland’s brief, at 53.
 

 The burden was upon Knowles, as the party seeking a summary judgment on the claim asserted in her complaint, to present evidence that would entitle her to a judgment as a matter of law “if this evidence was not controverted at trial.”
 
 Denmark,
 
 844 So.2d at 1195. This she did not do.
 

 III. Conclusion
 

 For the reasons stated above, the trial court erred in entering a summary judg
 
 *113
 
 ment for Knowles. Consequently, that judgment is reversed, and the cause is remanded for further proceedings.
 

 REVERSED AND REMANDED.
 

 STUART, SMITH, PARKER, and SHAW, JJ., concur.
 

 [1]
 

 . We express no opinion as to whether Amendment No. 744
 
 actually does
 
 authorize the type of activity here involved. That issue is not presented in this case.
 

 [2]
 

 . These answers to interrogatories were introduced by Knowles, herself, in support of her motion for a partial summary judgment and again in her renewed motion for a partial summary judgment.