830 So.2d 1214 (2002)
Brenda W. PICKLE
v.
IGT and Sam's Town Hotel and Gambling Hall.
No. 2001-SA-00951-SCT.
Supreme Court of Mississippi.
November 21, 2002.
*1215 T. Roe Frazer, II, Jackson, John Gordon Sims, II, attorneys for appellant.
Scott E. Andress, Gulfport, attorney for appellee.
Before PITTMAN, C.J., WALLER and GRAVES, JJ.
WALLER, J., for the Court.
¶ 1. Brenda W. Pickle appeals the judgment of the Tunica County Circuit Court affirming a decision of the Mississippi Gaming Commission denying her claim that she won a $4,724,894.39 wide area primary progressive jackpot at Sam's Town Hotel and Gambling Hall. We likewise affirm.

FACTS AND PROCEDURAL HISTORY

The Events of October 26, 1997
¶ 2. Brenda W. Pickle was playing a Wheel of Fortune Wide Area Progressive Jackpot game owned and operated by IGT[1] at Sam's Town Hotel and Gambling Hall in Robinsonville when, at approximately 12:46 a.m. on October 26, 1997, the machine which she was playing landed on Triple Bar-Blank-Blank, an apparent nonwinning combination.[2] However, the bells and whistles and all other indicators of a jackpot were activated, the overhead progressive meter reset to its $1,000,000 base, and IGT's computer system recognized a progressive jackpot hit. IGT also posted a *1216 progressive jackpot win on its internet site.[3]
¶ 3. Since this jackpot was in excess of $50,000, the Mississippi Gaming Commission was required to verify it. Miss. Gaming Comm'n Operations Manual § 5.1. Agent James Abney received a call at approximately 1:33 a.m. of a possible malfunction and arrived shortly thereafter. Abney inspected the machine and found that notwithstanding a non-winning reel alignment of Triple Bar-Blank-Blank on the payline, the machine was locked at $4,724,891.41 and the bells and whistles activated. Abney next viewed the surveillance tapes and posted a security guard at the machine. Abney phoned Special Enforcement Agent Jack Ruby at approximately 2:00 a.m. telling him that a patron had hit the jackpot but there was a problem because the reels did not line up. Ruby instructed Abney to have the IGT representative perform a five game recall test.[4] IGT service representative Tyrus Robinson was summoned, and, at approximately 3:05 a.m.,[5] he made a Polaroid picture of the reel display then entered the machine with the assistance of Sam's Town slot technician Bill Proctor to attempt a five game recall. Abney was standing right behind Robinson and Proctor while they conducted the tests. Robinson was unable to perform the five game recall because the machine had locked up. Later, at approximately 3:22 a.m.,[6] the machine was entered again to perform a reel strip test which meant the reel strips had to be partially removed from the reels themselves to get the real strip number off the back. This was noted on the machine's MEAL (Machine Entry and Access Log) card. This is why the machine displayed Blue 7-Blue 7-White 7 upon the arrival of D.C. Ladner, Director of the MGC Gaming Laboratory. Both entries were captured on surveillance. The reel strips on Pickle's machine were the correct strips for that type of machine.
¶ 4. Ruby arrived at Sam's Town at approximately 6:45 a.m. and was told of the possible malfunction. Ruby was also told that no one had been into the computer board. He later phoned Ladner with this information who thereafter drove to Robinsonville from Biloxi with Gaming Laboratory Engineer Alan Sang. Ladner and Sang arrived at Sam's Town at approximately 5:45 p.m. The results of the Gaming Laboratory investigation are discussed below.

"Wheel of Fortune" Wide Area Progressive Jackpot
¶ 5. A wide area progressive game is one in which play on slot machines throughout the state contribute to a jackpot that continually increments by a percentage of coins played into those machines.[7] Ali Saffari, *1217 IGT's Director of Firmware Engineering, explained the operation of the Wheel of Fortune Wide Area Progressive Jackpot. IGT, and not Sam's Town, actually owns and operates this game. At Sam's Town, the Wheel of Fortune games were clustered in a bank of six machines. Other casinos throughout the state have similar arrangements. Each bank also has an overhead meter displaying the current progressive jackpot value. The information regarding the activity of each Wheel of Fortune machine at a particular casino is sent to a Casino Computer (CCOM) located with those machines at the casino. The CCOM transmits accounting data and coins played data via a telephone line to IGT's central office in Gulfport. The central office is manned twenty-four hours a day, seven days a week, and houses IGT's Accounting Data System Communicator (ADSC) and Accounting Data System (ADS). The ADSC and ADS take the information received from the CCOMs at every casino participating in the Wheel of Fortune game and then constantly relay the current progressive values back to the CCOMs at the casinos. Those values are then displayed on the overhead meter and at each machine.[8]

The IGT S-Plus Slot Machine
¶ 6. Although the logic of the IGT S-Plus slot machine is quite complex, a simplification of its processes is necessary to understand what happened. Probably unbeknownst to most casino patrons, the operation of a modern slot machine is based on a computer program. While the machine is idle, its Random Number Generator (RNG) located on its SP chip is constantly generating numbers between one and four billion according to an algorithm. When a patron initiates a play with, for instance, a three-coin maximum bet as Pickle did, the SP chip will "grab" a random number and randomize it to a virtual reel position by applying another algorithm to reduce the random number to a number between one and 512. That number is then randomized to a number between one and 22 to arrive at a physical reel stop. The reel is then stopped. The process is repeated for reel two then reel three. It is at this point that the final results of the game are determined or, stated another way, the "essence of the game" is completed. These results are checksummed, i.e., verified, by repeating the mathematical process described above and then stored on the CMOS memory chip. The CMOS also stores the results of the previous five games.
¶ 7. Another chip, the SS chip or pay table chip, contains pay table information, reel strip information, symbol information, and winning amount information. The computer then evaluates the results; it compares on what the machine landed to the information on the SS chip. The SP chip will then instruct the machine accordingly based on the results as compared to the pay table, be it a payout or a jackpot.[9] In the event of a primary jackpot, the secondary notification process begins and the SP chip instructs the machine to lock *1218 up, reports the jackpot to the casino and IGT systems, and activates the bells, whistles, and lights. Every Wheel of Fortune slot machine throughout the state will then reset to the $1 million base. Also, the machine will have signage stating that a "malfunction voids all pays and plays."

Findings of MGC Gaming Laboratory
¶ 8. While at Sam's Town, Ladner checked to see if a specific wager had been made, checked to assure the machine had not been forcibly opened, and checked for signs of tampering of the security seals.[10] Ladner found everything to be normal. Determining that more testing was required, the machine was removed from the floor to Sam's Town slot shop. Ladner found that the fourth reel driver was installed backwards but that would have absolutely no effect on the machine since the Wheel of Fortune game was a three-reel game. The data from the RAM image were extracted from the CMOS and testing showed that the physical reel pointer data corresponded to a Triple Bar-Blank-Blank, the outcome on Pickle's machine. Also, the virtual reel data were determined to be valid because of a direct correspondence to the physical reel data. Ladner took the machine to the Gaming Laboratory in Biloxi and subsequently auto-played the machine nearly 280,000 times and was unable to replicate the event occurring when Pickle played. Ladner's conclusion stated:
The reel combination shown on the gaming device (Triple Bar Blank Blank) does correlate with the physical and virtual data. In the event of a RAM corruption, it is unlikely that the combination displayed and generated by the subject gaming device correctly displayed the outcome of the game. The secondary jackpot notification system was activated as the result of a technical problem.
That "technical problem" was the progressive bit was set during the evaluation process which then activated the downstream secondary notification system.

Course of Proceedings Below
¶ 9. Ruby sent Pickle a letter on October 30, 1997, stating the secondary notification "was activated as the result of a technical problem. After a thorough engineering review by the Mississippi Gaming Commission Laboratory we have concluded the symbols displayed by the machines correctly depicted the outcome of the game. Therefore, a jackpot did not occur." Although the Gaming Commission's report was not released until December 3, 1997, Ruby testified that he was notified by the MGC in Jackson of the laboratory's conclusions before sending Pickle the letter.
¶ 10. Pickle appealed to the Mississippi Gaming Commission Hearing Examiner. Hearing Examiner Larry Stroud received 33 exhibits, including all of the surveillance footage, and heard five days of testimony from Brenda Pickle, IGT officer J. Kenneth Creighton, Pickle's cousin Bobbie Pickle, Pickle's friend Valerie Hand, Pickle's husband Steve Pickle, Enforcement Agent James Abney, Special Enforcement Agent Jack Ruby, Gaming Laboratory Director D.C. Ladner, Sam's Town Slot Technician Bobby Proctor, Sam's Town Director of Surveillance Thomas Scott, IGT Director of Firmware Engineering Ali Saffari, expert witness for IGT Robert Sertell, and IGT Director of Administration for *1219 Mega Jackpots Susan Abernathy.[11] Based on this evidence, the Hearing Examiner concluded:
From the observable phenomena known shortly after the play there was contradictory evidence as to whether the play had resulted in a win or a loss. The reels clearly indicated a loss. The locking up of the machine, the candle lights flashing as they did, the noisemaker going off all indicated a win of a hand pay jackpot. Very soon after the play it was known that there was a report to the IGT slot tracking system in Gulfport of a win of a primary progressive jackpot. The freezing of the display on the machine reflecting the amount of the primary jackpot, and the reset amount appearing on all machines on this progressive link throughout the state, was an indication of a primary progressive win. As in all cases the trier of fact must weigh the evidence presented to it, and if the observable phenomena known shortly after the play was all the evidence available then the preponderance of the weight of the probative evidence would favor Pickle. While the reels serve the function of being the primary mechanism informing the patron of the outcome of the game, they are mechanical and are subject to problems. The electrical notification such as the candle lights, noisemakers, slot tracking, displays[,] and resetting of displays are probative and reliable evidence of the result of the play.
However, in this case there is more evidence to consider. When the IGT technician attempted simple and routine tests the machine froze up and refused to respond. This is more evidence that something was seriously wrong with the machine. The Gaming Laboratory of the Mississippi Gaming Commission checked the processor board for tampering and verified the chips and secured the memory of the CMOS from the processor board. From that CMOS extensive investigation was performed and the memory was found to be intact and reliable. The memory from the CMOS showed clearly that the result of Pickle's play was a losing combination: Triple Bar, Blank, Blank, the same as reflected by the reels. This result was derived by the processor only after doing the math twice and comparing the results to see if the same result was obtained. It was the opinion of all the experts that the SP chip had made a mistake in evaluating the results of the play. The SP chip's math is not redundant and no check summing was performed. For reasons that can only be speculated the SP chip erred and erroneously sent a signal that a primary progressive jackpot had been won. All the events called secondary by some witnesses, candle lights, noisemakers, machine locking up, reports to IGT slot tracking, displays resetting, flowed from this one error. The addition of the results of the Gaming Laboratory investigation and other expert testimony, along with all the other testimony heard and received, changes the balance of the weight of the evidence. The hearing examiner finds from the credible and probative evidence received at the hearing that the preponderance of the evidence weighs in favor of IGT in this dispute.
¶ 11. The MGC adopted the Hearing Examiner's findings and denied Pickle's claim. In turn, the Tunica County Circuit Court affirmed. Subsequent to the MGC's order, $3,724,894.39 was returned to the progressive meter. A patron at Grand Casino Biloxi later won the Wheel of Fortune *1220 jackpot, which at the time incremented to over $8 million and included the amount at issue in this appeal. Pickle appeals to this Court contesting the sufficiency of the evidence and asserting a violation of her due process rights.

STANDARD OF REVIEW
¶ 12. Pursuant to Miss.Code Ann. § 75-76-173(2) (2000), circuit court and Supreme Court judicial review afforded by the Mississippi Gaming Control Act is the exclusive method of reviewing Mississippi Gaming Commission actions. The standard of review for such appeals is outlined as follows:
The reviewing court may affirm the decision and order of the commission, or it may remand the case for further proceedings or reverse the decision if the substantial rights of the petitioner have been prejudiced because the decision is:
(a) In violation of constitutional provisions;
(b) In excess of the statutory authority or jurisdiction of the commission;
(c) Made upon unlawful procedure;
(d) Unsupported by any evidence; or
(e) Arbitrary or capricious or otherwise not in accordance with law.
Miss.Code Ann. § 75-76-171(3) (emphasis added). Also, we must adhere to a "deferential standard of review of an administrative agency...." Miss. Gaming Comm'n v. Freeman, 747 So.2d 231, 238 (Miss. 1999). See also IGT v. Kelly, 778 So.2d 773, 775 (Miss.2001). In Nevada, which employs the identical statutory standard of review, the Nevada Supreme Court held that "a reviewing court should affirm a decision of the Board which is supported by any evidence whatsoever, even if that evidence is less than that which a reasonable mind might accept as adequate to support a conclusion." Sengel v. IGT, 116 Nev. 565, 2 P.3d 258, 261 (2000) (emphasis in original) (citations omitted).

DISCUSSION
I. WHETHER THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE HEARING EXAMINER'S FINDINGS THAT PICKLE DID NOT WIN THE $4,724,894.39 PROGRESSIVE JACKPOT.
¶ 13. Pickle asserts that her substantial rights were violated because the Hearing Examiner's decision was not supported by the substantial weight of the evidence. She relies on our decision in Cook v. Mardi Gras Casino Corp., 697 So.2d 378 (Miss. 1997), to support her position that review of the circuit court's affirming of the Hearing Examiner's decision should be based on a "substantial evidence" standard. Pickle entirely misconstrues the proper standard of review. Cook was based on issues of jurisdiction and exhaustion of administrative remedies, obviously procedural issues, and not resolution of a patron dispute on its merits. As quoted above, Miss.Code Ann. § 75-76-171(3) is quite clear that the proper standard of review is the "unsupported by any evidence" standard. In two prior opinions, we have quoted Miss.Code Ann. § 75-76-171(3) as the proper standard of review. See Kelly, 778 So.2d at 775; Freeman, 747 So.2d at 238. Thus, our inquiry will now turn to whether there was "any evidence" sufficient to deny Pickle the jackpot.
¶ 14. Pickle alleges that IGT and Sam's Town took affirmative steps to disregard gaming regulations. In Ladner's report, he noted some "Secondary Concerns," most notably that "IGT did willfully use a substandard processor board taken from Sam's Town Casino stock. IGT was negligent in placing into service a *1221 processor board outside of their control."[12] Ladner also noted that "[t]his processor board had endured extensive repairs and proper testing procedures to ensure the proper operation of said processor board had been circumvented" as well as the fact that the U1 fourth reel driver was installed backwards.[13] These secondary concerns are pertinent only from a regulatory standpoint and had no bearing on Ladner's conclusions. At the hearing, Ladner testified:
In essence, the secondary concerns, because of our regulatory authority that we have, in response to this, those concerns are issued from a regulatory standpoint. Those are concerns as to operations of the game; some of the processes and procedures that we would like to see in place, to ensure disputes like this would not occur. And those are some of the essence of why the secondary concerns exist in the report. They have nothing to do with the determination on whether the outcome of the game was valid or not. So, they are separate and distinct issues and the secondary concerns relate to our regulatory ability and some of the concerns that we have with the operation of the device.
(emphasis added). As is obvious, the secondary concerns of the processor and fourth reel driver were merely regulatory and by no means warrant an award of a jackpot that was not validly won.
¶ 15. It was established at the hearing that the activation of the secondary notification system was a result of an erroneous setting of the progressive bit in the evaluation process. Saffari testified to that effect and Ladner's report noted that as well. While Pickle is undoubtedly correct in her argument that the reels are not indicative of the outcome of the game,[14] the data extracted from the machine conclusively established that the true outcome of the game was in fact Triple Bar-Blank-Blank. Pickle relies on the bells, whistles, resetting of meters, and internet posting which were the downstream effects of the setting of the progressive bit. In that respect, the machine operated as designed. However, the evidence is sufficient to establish that this secondary notification system was activated in error when it is obvious Pickle's machine generated a losing combination.
¶ 16. Pickle next alleges that Sam's Town hindered the MGC's investigation by opening the machine before an agent arrived. This argument is totally baseless and without merit. While she is correct that Robinson and Proctor entered the machine prior to Ruby's arrival, she completely neglects to mention that Agent Abney was standing right behind Robinson and Proctor as they attempted the five game recall test. At the hearing, Abney testified:
Q: Had you taken any steps to secure the machine to make sure that it was not tampered with in any way?
A: Yes, sir, there was a security officer posted at the machine.
Q: Okay. What did you do when IGT arrived?
*1222 A: Once IGT arrivedit was Tyrus Robinson, service rep for IGT along with Sam's Town service tech Bill Proctor, we proceeded to the machine to inspect the machine.
Q: What did you do while they did that?
A: Actually, I was just observing, you know, from behind, while they entered the machine.
(emphasis added). Not only does Pickle fail to mention that Abney observed Robinson and Proctor enter the machine, she also fails to state that Abney arrived at the machine before Robinson.
¶ 17. In our opinion, there was more than enough evidence to meet the "unsupported by any evidence" standard. Notwithstanding any alleged violations of gaming regulations, the evidence supported the Hearing Examiner's findings. Regarding regulatory violations, in Thomas v. Isle of Capri Casino, 781 So.2d 125, 130 (Miss. 2001), we affirmed a decision of the MGC denying a jackpot when the casino failed to notify the MGC's executive director of a patron dispute and engaged in spoliation of evidence by taking the machine off of the casino floor and then removing its Central Processing Unit. As such, Pickle is not entitled to the jackpot. We will next address Pickle's due process arguments.
II. WHETHER PICKLE'S DUE PROCESS RIGHTS WERE VIOLATED.
¶ 18. Pickle contends that the MGC investigation was unsatisfactory and amounted to a violation of her due process rights. She argues that the "Casino controls the rules, evidence, and process." Specific allegations of due process violations are: the Hearing Examiner relied solely upon the speculation by the MGC and IGT in deciding there was no jackpot; Agent Abney never spoke to Pickle or her companions about the events of October 26, 1997; Special Agent Ruby's letter to Pickle was not well-founded because he concluded the "symbols displayed by the machine correctly depicted the outcome of the game"; and Ruby issued Pickle the letter before receiving the report from the Gaming Laboratory.
¶ 19. Regarding speculation by the MGC and IGT, the correlation of the virtual reel data and physical reel data to a Triple Bar-Blank-Blank, a non-winning combination, is beyond speculationit is conclusive. The MGC Gaming Laboratory determined and IGT confirmed that the actual result of Pickle's game was a losing combination. Pickle's claim that the Gaming Laboratory engaged in speculation in its analysis of the data is disingenuous.
¶ 20. As for the gaming agents' handling of the situation, there is nothing to indicate a due process violation. Pickle alleges that Abney did not speak with her about the alleged jackpot but only spoke with IGT and Sam's Town officials, yet she admits that during her two-day stay at Sam's Town, "[s]he spoke to many individuals including representatives from Sam's Town, IGT, and the Mississippi Gaming Commission." (emphasis added).
¶ 21. Special Agent Ruby sent Pickle a letter on October 30, 1997, stating the supposed jackpot was not valid. Pickle argues this letter was unsupported since the Gaming Laboratory's report was not released until December 3, 1997. Ruby was, however, notified of the laboratory's conclusion by MGC offices in Jackson that the ruling was in favor of IGT. Just because Ruby did not have a complete and released investigative report from the Gaming Laboratory does not mean the investigation was not performed or the letter was hasty or arbitrary.
¶ 22. Pickle received all of the due process to which she was entitled. She was *1223 afforded notice and an opportunity to be heard, since, after all, the hearing was five days long. The facts of this case in no way approach those of Grand Casino Biloxi v. Hallmark, 823 So.2d 1185 (Miss.2002), in which we awarded a jackpot due to violations of a patron's right to due process. In Hallmark, Grand Casino failed to provide notice to the MGC of a patron dispute and destroyed the surveillance tape and custom buffer report rendering the MGC investigation inconclusive and incomplete. Id. at 1194. In the instant case, a gaming agent was at the machine within an hour, all surveillance was preserved, and all entries into the machine were monitored. We find no due process violation.

CONCLUSION
¶ 23. We find that Pickle did not win the $4,724,894.39 Wheel of Fortune progressive jackpot and that her due process rights were not violated. The Mississippi Gaming Commission's decision was supported by the evidence and was not arbitrary or capricious. Therefore, the judgment of the Tunica County Circuit Court upholding the decision of the Mississippi Gaming Commission is affirmed.
¶ 24. AFFIRMED.
PITTMAN, C.J., SMITH, P.J., COBB, DIAZ, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., AND EASLEY, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION.
NOTES
[1] IGT is based in Reno, Nevada, and licensed by the Mississippi Gaming Commission to operate progressive jackpot games.
[2] The winning combination for this particular progressive jackpot game is a lineup of three Wheel of Fortune symbols across the pay line.
[3] It was established that the segment of IGT responsible for the internet site had no knowledge the jackpot would not be paid until eleven days later, at which time the posting was removed.
[4] By regulation, slot machines "[m]ust have previous and current game data recall." Miss. Gaming Regs. Ch. IV § 4(j). This means that the computer will move the reels to the positions of the previous five games played.
[5] Sam's Town technician Bobby Proctor's entry on the MEAL card indicated the first entry was at 4:05 a.m. The reason for this apparent discrepancy is that on October 26, 1997, the time reverted back to Central Standard Time, and Sam's Town was not scheduled to revert back until 6:00 a.m.
[6] Again, the MEAL card indicated 4:22 a.m. See note 4.
[7] Gaming regulations define "wide area progressive jackpot" as "a payoff on a slot machine that is a part of a network of machines located at the establishments of more than one licensee, which payoff increases automatically over time or as that machine or others that are part of the network are played." Miss. Gaming Regs. Ch. III.B § 2(a)(4).
[8] There is an inevitable time delay throughout this process. That is why the jackpot in issue is $4,724,894.39 and not $4,724,891.41 as displayed on the machine. Winning patrons are awarded the updated amount.
[9] Pickle argues in her brief and at oral argument that her machine was in the "Hand Pay Lockup" stage of its logic progression and that IGT expert Ali Safarri testified to as much. However, Safarri testified that Pickle's machine was in "Hand Pay Lockup" as the result of an error in the evaluation program which precedes the progression into the "Hand Pay Lockup" mode and erroneously caused it to go into that mode.
[10] The security seal on this particular machine was installed by an independent contractor of the MGC over the chips operating the game and reels. IGT placed another security seal, not required by regulation, over the lock to the cage housing the Central Processing Unit. Both seals were intact when Ladner began his investigation.
[11] Tyrus Robinson did not testify at the hearing.
[12] The processors used on these types of machines are generic, and the one used in Pickle's machine was from Sam's Town stock.
[13] As noted before, the Wheel of Fortune game is a three-reel game; the fourth reel was never used.
[14] It is ironic that Pickle would repeatedly argue that the outcome of the game is determined before the reels come to rest. The data which actually control where the reels come to rest, the virtual reel data and physical reel data, indicated a losing combination of Triple Bar-Blank-Blank.