# IN THE SUPREME COURT OF IOWA

No. 14–0802

Filed April 24, 2015

**PAULINE McKEE,**

Appellant,

vs.

**ISLE OF CAPRI CASINOS, INC.** and **IOC BLACK HAWK COUNTY, INC.,**

Appellees.

Appeal from the Iowa District Court for Black Hawk County, Todd A. Geer, Judge.

A casino patron who sued to recover a bonus allegedly won on a slot machine appeals the district court's grant of summary judgment to the casino. **AFFIRMED.**

Stephen J. Powell of Swisher & Cohrt, P.L.C., Waterloo, and Steven R. Enochian of Low McKinley Baleria & Salenko, Walnut Creek, California, for appellant.

Stacey L. Cormican of Nyemaster Goode, Cedar Rapids, and Mark A. Schultheis of Nyemaster Goode, P.C., Des Moines, for appellees.

**MANSFIELD, Justice.**

This case requires us to apply ordinary contract principles to an extraordinary event. While playing a penny slot machine, a casino patron obtained a win of 185 credits, or $1.85, based on how the symbols had lined up. However, at the same time a message appeared on the screen stating, "Bonus Award - $41797550.16." The casino refused to pay the alleged bonus, claiming it was an error and not part of the game. The patron brought suit against the casino, asserting breach of contract, estoppel, and consumer fraud. The district court granted summary judgment to the casino. The patron appealed.

On appeal, we conclude the district court's grant of summary judgment was proper. The rules of the game formed a contract between the patron and the casino, and the patron was not entitled to the bonus under those rules. Further, the patron failed to prove the necessary elements of either promissory or equitable estoppel. At no time did the casino represent to her that a bonus would be available if she played the game, nor did the casino promise to pay the $41 million after the notice was displayed. In any event, the patron did not detrimentally rely on any representation by the casino. Finally, the patron failed to present proof of an ascertainable loss sufficient to warrant recovery on her consumer fraud claim. We therefore affirm the district court's ruling granting summary judgment to the casino on all three counts.

## I. Background Facts and Proceedings.

On July 2, 2011, Pauline McKee, an eighty-seven-year-old grandmother of thirteen living in Antioch, Illinois, was attending a family reunion in Waterloo. That evening, she and several members of her family gambled at the Isle Casino Hotel Waterloo operated by IOC Black Hawk County, Inc. (hereinafter jointly referred to as "the casino"), a

combination hotel and casino where some members of the reunion party were staying. Around nine o'clock, one of McKee's daughters invited McKee to sit down next to her and play a slot machine called "Miss Kitty." McKee had played slot machines two to three times per year since she was approximately twenty-one years old, but had never played this particular game before.

The Miss Kitty game is a penny slot machine manufactured by Aristocrat Technologies, Inc. (Aristocrat). It displays five reels and fifty paylines on a video screen. To play the game, a patron selects the number of paylines and the amount bet per line. One cent buys one credit, and one half credit buys one line. A player's total bet is calculated by multiplying the number of credits by the number of lines bet. Therefore, although it is called a penny machine, it is possible to bet more than just one cent per spin. As with other slot machines, a person wins at the Miss Kitty game by lining up different combinations of symbols from left to right on the paylines.

The game includes a button entitled "Touch Game Rules" in the lower left-hand corner of the screen. Tapping this button displays the rules that govern the game and a chart describing potential winning combinations of symbols, known as a paytable. The first page of the rules reads as follows:

> TOTAL BET is the number of credits on the LINES button multiplied by the number on the BET button. TOTAL BET and lines played during the free games are the same as for the game that started the feature. Choose your number of paylines, then choose your bet per line to begin game. Highest win paid on any lit payline except for scatters which are added to payline wins. Scattered [moon emblem] wins added to payline wins. All wins shown in credits. All wins multiplied by credits bet per line except scatters. Wins on different lit paylines added. All wins on lines played except scatters which are added to payline wins.

MALFUNCTION VOIDS ALL PAYS AND PLAYS. . . .

The next rules screen states, "All wins begin with leftmost reel, and pay left to right only on adjacent reels."  Additionally, the rules provide that when three "scattered moon" symbols appear left to right on adjacent wheels, the player wins double the total amount displayed. Furthermore, when three "scattered moon" symbols appear on the screen, the game enters a special mode called "Sticky Wild™ Free Games Feature" that lasts for ten games.  During these ten games, any wild symbol (represented by a Miss Kitty emblem) that appears on the screen "sticks" and stays in place for the rest of the ten games, thereby making it easier for the patron to complete winning patterns.

The third rules screen explains there are eleven symbols other than the moon and Miss Kitty wild images, each with varying credit values.  The fourth screen displays the paytable entitled "Paylines." Finally, a sign posted on the front of the machine reiterates, "MALFUNCTION VOIDS ALL PAYS AND PLAYS."

The parties agree that all the potential ways of winning from lining up various combinations of symbols are accurately listed in the rules and paytable.  The rules and paytable do not mention any additional bonuses, jackpots, or prizes available to a patron playing the Miss Kitty game.

McKee did not read the rules of the game or look at the paytable before playing the Miss Kitty game.  Around 10:00 p.m., after McKee had been using the machine for a while, she wagered $0.25 on a particular spin.  The following message appeared:

Credit    Bet    Win

1810    25    185

The reels have rolled your way!

Bonus Award - $41797550.16

Beneath this message was a five-by-four configuration of symbols. It is undisputed that under the rules of the game, McKee was entitled to a win of 185 credits, or $1.85, based on that alignment of symbols. The dispute, of course, concerns the "Bonus Award" of $41,797,550.16.

Believing she had won a large bonus, McKee and her daughter summoned a casino attendant to the machine. An employee responded and accessed the main door of the game to clean the central processing unit. The senior supervisor/shift manager on duty that night was also called to the machine to investigate. The supervisor photographed the display on the Miss Kitty machine. A slot technician restarted the game. The supervisor informed McKee and her daughter that she needed to make a few phone calls and gave McKee a $10 card to play other games while she waited. Eventually, a casino manager instructed the supervisor to block off the machine pending further investigation. The supervisor paid McKee the $18.10 she had won on the Miss Kitty machine up to that point. The supervisor explained the casino was looking into the machine and informed McKee her room would be paid for by the casino. No employee of the casino ever informed McKee that she would actually receive the $41,797,550.16 bonus.

The next day, the vice president/general manager of the casino also investigated the incident and left a note and her business card for McKee. She concluded it was an "unusual situation" and comped the additional rooms that McKee's family members were staying in. She explained the casino had informed the Iowa Racing and Gaming Commission (IRGC) of the situation and that the machine would be secured and studied.

The IRGC conducted an independent investigation. As part of this investigation, it sent the hardware and software from the Miss Kitty machine to a testing laboratory, Gaming Laboratories Inc. (GLI), along with related documentation and other materials. GLI's analysis concluded as follows:

> The logs on the machine do indicate that it thought it received a legacy bonus.[1] However, in reviewing the legacy bonusing aspect of SAS [the casino's "slot accounting system"] it was noticed that the SAS legacy bonus command can send a bonus up to $99999.99, which is far less than was awarded by the game. Furthermore, the system does not support legacy bonusing. As a result, it appears the SPC board [hardware inside the Miss Kitty machine] erroneously determined that it received a legacy bonus award from the system and sent it to the game.
>
> . . . .
>
> In conclusion, GLI was unable to definitively determine the exact cause of the erroneous bonus award. However, it is apparent, based on the reviewed information that the bonus award was not valid. Unfortunately, given the lack of conclusive evidence, GLI cannot confidently speculate as to how the bonus amount was received and displayed at the gaming machine in question. However, it is highly likely that the erroneous message originated from the SPC 2.0 communication board and was then relayed to the game.

The IRGC also requested information from the manufacturer of the machine, Aristocrat. Aristocrat responded to the IRGC with a letter concluding that the bonus displayed on the screen was an error. It noted it had previously issued a bulletin regarding the issue:

> ATI [Aristocrat Technologies, Inc.] has been aware of the possibility of an erroneous value being displayed under this type of situation, i.e., where "Legacy Bonusing" is enabled on the gaming machine without the required poll.

---

[1]Although the record is somewhat unclear as to what a "legacy bonus" is, it appears to be a form of bonus transmitted from the casino's central system to the specific machine. Regardless, it is undisputed that bonuses were not a part of the Miss Kitty game.

In response to the possibility of this type of erroneous display, ATI previously provided a Technical Information Bulletin to the Industry in November, 2010. The Technical Bulletin outlined the issue and the course of action Aristocrat was taking in developing a new System Base and SPC2, as well as ATI's recommendation to casinos for disabling of the bonus option as a preventative action.

The technical bulletin the casino had received from Aristocrat described the problem as follows:

> A rare and unlikely circumstance has been discovered when legacy bonusing is enabled on the MKVI™ platform when used with the SPC2.0 – an erroneous bonus amount can be awarded to the machine, which may cause the machine to go into an attendant hand pay condition with the erroneous bonus amount displayed on the screen. Aristocrat believes that SPC2.0 component degradation over time may increase the susceptibility to this rare occurrence.

An accompanying product notification described the solution to the problem as a "Non-Mandatory upgrade" and stated "[t]he conditionally revoked version must be replaced in the field by August 31, 2011."

The record also indicates that this machine had been serviced earlier in the evening of July 2 and that the CPU had been cleaned and reinstalled around 7:30 p.m.

As a result of the IRGC's investigation, administrator Brian Ohorilko wrote a letter to the casino manager concluding the bonus was an invalid display. The letter stated, in relevant part:

> Based on the information available and received, the jackpot amount displayed on the slot machine game screen is not valid. . . . The information pertaining to the maximum award was displayed on the pay table of the slot machine; therefore the maximum award information was available to the player prior to playing. In addition, the symbols on the slot machine game screen resulting from the spin by the patron demonstrated a combination that should pay out $1.85 as verified by the paytable on the slot machine . . . .
>
> . . . .

In summary, IRGC staff has confirmed that the slot machine game malfunctioned and did not operate in accordance with the representation made to the commission.

Based on the IRGC's determination that the bonus award displayed on the screen was not valid, the casino refused to pay McKee the $41,797,550.16.

McKee filed suit against the casino in the Iowa District Court for Black Hawk County on January 26, 2012. She alleged the casino had breached a contract to pay her the bonus, the casino should be estopped from refusing to pay the award, and the casino's actions violated Iowa's Consumer Fraud Act. *See* Iowa Code § 714H.5 (2011).

The casino moved for summary judgment. In support of its motion, the casino attached numerous exhibits, including a copy of its license from the IRGC, a photograph of the screen displaying the award message, the Miss Kitty instruction screens and paytable, a copy of the IRGC's letter, and excerpts from McKee's deposition. McKee resisted the motion for summary judgment and submitted her own exhibits, including two depositions from McKee herself, numerous excerpts from depositions of casino employees, copies of the GLI and Aristocrat letters, interrogatory answers from her expert indicating the award was not the result of a malfunction, and the log from the slot machine in question.

The district court granted the casino's motion on all three counts in a ruling issued on October 15, 2013. With respect to the contract claim, the court stated that all gambling contracts in Iowa are governed by chapter 99F. *See* Iowa Code ch. 99F. Observing that this chapter grants regulatory authority to the IRGC, the court concluded the rules of the game approved by the IRGC constituted the contract between McKee and the casino:

These written, approved rules of the Miss Kitty game formed the gambling contract between McKee and the casino. McKee could have read the rules of play had she chosen to do so. Although she did not actually read the rules of the game, she was nevertheless bound by them when she chose to play the game. By doing so, she entered into a written, binding, "aleatory" contract with the casino. [A]n aleatory contract is one in which a party's duty to perform is conditioned upon some fortuitous event, such as winning at a slot machine. . . . Under the aleatory contract in this case, McKee promised to pay a certain amount of money and place bets, and the casino promised to give her an award based on what bets she made and the way the "reels" lined up at the end of the game of chance. On the play in question, the alignment of the reels entitled her to a prize of $1.85, and the casino paid it to her, fulfilling its side of the contract.

. . . .

In this case, Plaintiff seems to simultaneously argue that the "bonus" shown on the game screen was both directly related to the playing of the game, and completely separate from it. On the one hand, during the hearing on the current motion, Plaintiff asserted that the bonus shown on the screen was not related to the alignment of the reels, but rather to a "legacy bonus payout system." Plaintiff argued that such bonuses are marketing tools not subject to IRGC regulation, analogous to such "bonuses" as free rooms or meals for loyal patrons. As such, Plaintiff argued, the bonuses exist outside the written rules of the game itself.

The Court finds this argument unconvincing. Although the casino had enabled a "legacy bonus" feature on the slot machine, Plaintiff had no reason to believe that by playing the game she might be able to win any money beyond that related to the rules of the game.

(Alteration in original.) (Citations omitted.) (Internal quotation marks omitted.)

The court went on to grant summary judgment to the casino on McKee's equitable and promissory estoppel claims as well. It noted "neither version of estoppel can be used to undo the terms of an express, written contract." It also concluded McKee's promissory estoppel claim failed because she did not provide evidence of either a clear and definite promise or detrimental reliance. Additionally, the court rejected McKee's

consumer fraud claim, reasoning that she had not suffered an "ascertainable loss of money or property" based on fraud. *See* Iowa Code § 714H.5(1). At most, McKee had not received a $41 million bonus she claimed to be entitled to.

Subsequently, McKee filed a rule 1.904(2) motion asking the court to enlarge or amend its findings and reconsider its grant of summary judgment to the casino. McKee argued the court should not have considered the IRGC's letter determining the Miss Kitty game malfunctioned. She maintained the letter was irrelevant since the IRGC did not have jurisdiction to resolve disputes between casinos and patrons. McKee also claimed the record evidence did not support the court's conclusion that there was an express contract between her and the casino. She further urged that whether or not the machine had "malfunctioned" was a question of fact that precluded summary judgment. Likewise, McKee argued the evidence did not support a finding of summary judgment with respect to the estoppel or consumer fraud claims. Finally, McKee requested the court to consider several depositions that had been taken after the summary judgment hearing but before the court's ruling.

The casino opposed McKee's rule 1.904(2) motion, maintaining that McKee should not be permitted to offer new evidence and that the court's initial ruling on summary judgment had been correct. On April 23, 2014, the court ruled on McKee's rule 1.904(2) motion. It stated it had reviewed all the new evidence, including McKee's additional depositions, and still concluded that no issues of material fact precluded summary judgment in the casino's favor.

McKee appealed on May 14, and we retained the case. The casino moved to dismiss the appeal, claiming it was untimely. It stated that

McKee's rule 1.904(2) motion was filed for an improper purpose (to introduce new evidence), and therefore did not toll the period in which to file an appeal, resulting in an untimely notice of appeal. We ordered the motion to dismiss submitted with the appeal.

## II.  Standard of Review.

We review grants of summary judgment for correction of errors at law. *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 65 (Iowa 2014). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Rosauer Corp. v. Sapp Dev., L.L.C.*, 856 N.W.2d 906, 908 (Iowa 2014). We view the record in the light most favorable to McKee because she is the nonmoving party. *See Shelby Cnty. Cookers, L.L.C. v. Util. Consultants Int'l, Inc.*, 857 N.W.2d 186, 189 (Iowa 2014).

While actions brought under the Consumer Fraud Act are normally tried in equity and reviewed de novo, when they are resolved on a motion for summary judgment, our review is for the correction of errors at law. *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 524 (Iowa 2005).

## III.  Timeliness of the Appeal.

We first address the casino's motion to dismiss McKee's appeal as untimely. Our court rules provide that a party must file a notice of appeal from a final order of the district court within thirty days. Iowa R. App. P. 6.101(1)(*b*). When an appeal is not filed within the limitations period, we do not have subject matter jurisdiction over the appeal. *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 668 (Iowa 2013). However, if a party files a timely and procedurally proper motion under Iowa Rule of Civil Procedure 1.904(2), this extends the deadline for filing the notice of appeal to thirty days after the ruling on the motion. *See* Iowa R. App. P.

6.101(1)(*b*).   The casino contends that because McKee's rule 1.904(2) motion was filed for an improper reason, it failed to toll the filing period for her appeal, and her subsequent notice of appeal was rendered untimely.  *See In re Marriage of Okland*, 699 N.W.2d 260, 266–67 (Iowa 2005) ("[A]n untimely or improper rule 1.904(2) motion cannot extend the time for appeal." (Footnote omitted.)).

Generally speaking, a party cannot use a rule 1.904(2) motion to introduce new evidence.  *See In re Marriage of Bolick*, 539 N.W.2d 357, 361 (Iowa 1995) ("Motions under rule [1.904(2)'s predecessor] are permitted so that courts may enlarge or modify findings based on evidence already in the record. They are not vehicles for parties to retry issues based on new facts.").  However, that was not the *only* basis for McKee's motion.  For example, McKee's motion also challenged the district court's repeated references to a "malfunction" in its summary judgment ruling, emphasizing that on the record as it existed before that ruling, whether the Miss Kitty machine had malfunctioned was a disputed issue of material fact.  Furthermore, McKee noted the casino had not requested summary judgment on the basis of an undisputed malfunction.  The district court in fact modified this aspect of its original ruling when it acted on McKee's motion.

In *Tenney v. Atlantic Associates*, we determined the plaintiff's motion was adequate to toll the appellate filing period, despite the fact the plaintiff had requested the court to consider new evidence, because the motion also had a proper purpose.  *See* 594 N.W.2d 11, 14 (Iowa 1999).  We noted:

> It is true the postjudgment motion relied on evidence that had not been included in the original resistance, but it also relied on evidence that *had* been included in the resistance. . . .  The plaintiff's motion asked the court to modify the

judgment in light of this [existing] evidence and was a proper motion . . . .

*Id.* For similar reasons, we conclude McKee's appeal was timely and the casino's motion to dismiss should be denied.

### IV. Merits of the Summary Judgment Ruling.

Having determined the appeal was timely, we turn now to the merits. McKee contends the court committed legal error in granting summary judgment on the three counts of her petition: breach of contract, estoppel, and consumer fraud. We will address each in turn.

**A. Breach of Contract.** McKee claims summary judgment was inappropriate on her contract claim because the court incorrectly concluded there was an express contract. She urges us instead to find that only an implied contract existed and it should be for the factfinder to determine its terms. She further claims that any contract between the two parties was ambiguous, thereby generating another fact question for the jury.

Gambling contracts are governed by traditional contract principles. *See Blackford v. Prairie Meadows Racetrack & Casino, Inc.,* 778 N.W.2d 184, 189 (Iowa 2010). A contract can be either express or implied. *Rucker v. Taylor,* 828 N.W.2d 595, 601 (Iowa 2013). We have recently explained the difference between express and implied contracts:

> When the parties manifest their agreement by words the contract is said to be express. When it is manifested by conduct it is said to be implied in fact. Both are true contracts formed by a mutual manifestation of assent by the parties to the same terms of the contract. The differentiation arises from the method of proving the existence thereof.

*Id.* (internal quotation marks omitted). "[T]he law will not imply a contract where there is an express contract." *Scott v. Grinnell Mut. Reins. Co.,* 653 N.W.2d 556, 562 (Iowa 2002) (alteration in original) (internal

quotation marks omitted); *see also* 1 Richard A. Lord, *Williston on Contracts* § 1:5, at 40 (4th ed. 2007) ("The law may recognize an implied contract in the absence of an express contract on the same subject matter, but not where there is an express contract . . . .").

We agree with the district court that the Miss Kitty rules of the game are the relevant contract here and that they form an express contract. "It is hornbook law that the rules of a contest constitute a contract offer and that the participant's [entry into] the contest constitute[s] an acceptance of that offer, including all of its terms and conditions." *Sargent v. N.Y. Daily News, L.P.*, 840 N.Y.S.2d 101, 103 (App. Div. 2007) (first alteration in original) (internal quotation marks omitted); *see also* Anthony Cabot & Robert Hannum, *Advantage Play and Commercial Casinos*, 74 Miss. L.J. 681, 682–83 (2005) ("Casino-style gambling involves a contract, which is simply a promise, or set of promises, between the casino and the player." (Footnote omitted.)).

Further, it is undisputed the rules of the Miss Kitty game did not provide for any kind of bonus. Hence, in our view, McKee had no contractual right to a bonus. Any message appearing on the screen indicating the patron would receive a $41 million bonus was a gratuitous promise and the casino's failure to pay it could not be challenged as a breach of contract. *See Margeson v. Artis*, 776 N.W.2d 652, 655 (Iowa 2009) ("[C]ontract law exists to enforce mutual bargains, not gratuitous promises."). Consider the other side of the coin: Suppose the symbols had aligned so that McKee was entitled to a payout under the rules of the game, but the machine did not inform her of a payout. Would the casino have been obligated to compensate her despite the absence of a notification that she had won? We think so.

Nor is it relevant that McKee failed to read the rules of the game before playing it. It is sufficient that those rules were readily accessible to her and she had an opportunity to read them. *See Huber v. Hovey*, 501 N.W.2d 53, 55 (Iowa 1993) ("[F]ailure to read a contract before signing it will not invalidate the contract. Absent fraud or mistake, ignorance of a written contract's contents will not negate its effect." (Citation omitted.)).

Courts in other jurisdictions, when confronted with bonus payout claims against casinos, have regularly applied the foregoing standard contract principles. In *Eash v. Imperial Palace of Mississippi, LLC*, the Mississippi Supreme Court held a patron was limited to the $8000 payout listed in the game's rules rather than the $1,000,000 bonus that had appeared on the game screen. 4 So. 3d 1042, 1048 (Miss. 2009). Eash was playing a slot machine at the casino when a message scrolled across the screen reflecting a 200,000 credit "Jackpot" totaling $1,000,000. *Id.* at 1043. The rules of the game as displayed on the machine, however, indicated the maximum available award was only $8000. *Id.* at 1043–44. The court concluded that the display of a higher jackpot amount than was available under the posted rules did not create an ambiguity in the gambling contract:

> The fact that the electronic displays erroneously stated that Eash won $1,000,000 after she hit the winning combination does not create an ambiguity . . . . Though it unfortunately caused some confusion, there was no indication from anything on the machine *before* Eash began playing that indicated that a patron could win anything more than $8,000 with three double diamonds lined up on the pay line. In other words, there was no question, *ex ante,* as to what a winning combination was or what the corresponding award would be on the machine in this case.

*Id.* at 1047.

In *Pickle v. IGT*, the same court turned down a slot machine player's claim under similar circumstances. 830 So. 2d 1214, 1223 (Miss. 2002). There the machine displayed three symbols that, per the rules of the game, were not a winning combination. *Id.* at 1215. However, the machine simultaneously indicated the patron had won a jackpot, and the machine's bells and whistles went off. *Id.* at 1215–16. An investigation revealed that the displayed symbols correctly depicted the outcome of the game (i.e., not a winner) rather than the jackpot notification sounds. *Id.* at 1218. The Mississippi Supreme Court upheld the investigator's conclusion that "the symbols displayed by the machines correctly depicted the outcome of the game" and the patron was not entitled to the jackpot money despite the noises indicating a win. *Id.* at 1218, 1222 (internal quotation marks omitted).

In another case, the Alabama Supreme Court overturned a multimillion dollar award in favor of a casino patron, finding that genuine issues of material fact necessitated a trial. *Macon Cnty. Greyhound Park, Inc. v. Knowles*, 39 So. 3d 100, 112–13 (Ala. 2009). The patron, Knowles, had been playing an electronic bingo machine at the casino when she hit a "snake eyes" combination, which was worth only two credits according to the game's paytable. *Id.* at 105–06, 112. Nevertheless, the machine's lights went off and the credits on the machine began to accumulate up to an amount worth at least $10,000,000. *Id.* at 106. Knowles contended, in part, that the rules should not govern the disputed payout because they were not visible on the face of the machine, but rather were only viewable if she pushed a button to read them—an action she did not do. *Id.* at 110. The court found it immaterial that Knowles had not actually read the rules. *Id.* at 111–12. It further determined that summary judgment for Knowles was

improper because the casino's evidence indicated the snake eyes display was worth only two credits. *Id.* at 112.

To the same effect is *Miller v. Sodak Gaming, Inc.*, 93 F. App'x 847, 848 (6th Cir. 2004). There, despite a patron's claim she had won a $1.5 million jackpot based on lights and music coming from the slot machine she was using, the court held she was not entitled to an award because there was "no genuine issue of material fact that Miller was not a jackpot winner under the rules of the game." *Id.* at 848–49. These authorities support the grant of summary judgment in this case.

In contrast, the Louisiana Court of Appeals directed a casino to pay bonuses of $65,581.00 and $32,790.50 respectively to two patrons even though the bonuses were allegedly more than the maximum payout the machine had been programmed to award. *Ledoux v. Grand Casino–Coushatta*, 954 So. 2d 902, 904, 909 (La. Ct. App. 2007). In that case, two plaintiffs on separate occasions had played the same slot machine game. *Id.* at 908. Both times, the monitor displayed a combination of three "7s" and indicated the patrons had won a "Bonus Spin." *Id.* When the patrons played the bonus round, the monitor on the machine indicated they had won the large jackpots in question. *Id.* In both instances, although employees of the casino initially congratulated the patrons, the casino later refused to pay the bonuses because they were a higher amount than the machine was supposedly programmed to award for a display of three "7s." *Id.* at 908–09.

*Ledoux* is distinguishable from the present case. There, the casino did not dispute that the rules of the game included a bonus wheel and that the patrons had qualified for a bonus; moreover, there was no indication in those rules that the amount of any given bonus was limited. *See id.* at 909–10. This contrasts with the present case, where McKee

seeks an award of a random bonus not available under the rules of the game.

Additionally, in *Ledoux,* after rejecting the casino's rules-of-the-game defense, the court then turned to the issue of whether there had been a machine malfunction, a second defense asserted by the casino. *Id.* at 910. At that point, the court found the casino had not presented sufficient evidence to show a malfunction had in fact occurred. *Id.* at 910–11. The court explained,

> [W]here there was no apparent malfunction indication by the slot machine itself, a casino may not rely on the argument that the machine was not intended to register the particular jackpot to deny payment. That is to say, there must [be] objective proof of a malfunction.

*Id.* at 912. Here, the district court did not reach the question of malfunction, and neither do we.

Another case where the patron prevailed because recovery was available under the rules of the game is *IGT v. Kelly,* 778 So. 2d 773, 774–75 (Miss. 2001) (en banc). There the Mississippi Supreme Court found a patron was entitled to a large bonus for a display of a royal flush on a video poker game. *See id.* at 779. A sign on the machine stated that a sequential royal flush in hearts would garner a large sum of money. *Id.* at 774. In parentheses, the sign gave the example of a "10, J, Q, K, A" in hearts. *Id.* at 775. Kelly played the machine and received an A, K, Q, J, 10 of hearts. *Id.* at 774. The casino claimed that only an *ascending* royal flush—rather than a *descending* one like Kelly had received—was sufficient to win the prize. *Id.* The gaming commission, in a finding upheld by the Mississippi Supreme Court, determined the patron should prevail because the sign did not specify that *only*

ascending royal flushes would win or that the example on the sign was only accurate if read from left to right. *Id.* at 774, 779.

Unlike in *Kelly*, in this case, the rules made no mention of the possibility of bonuses or jackpots beyond the actual winnings based on different reel combinations. In short, "there was no question, *ex ante,* as to what a winning combination was or what the corresponding award would be on the machine." *Eash*, 4 So. 3d at 1047. The parties' express contract did not include the possibility of winning a bonus, but was rather limited to the display of different reel combinations and their corresponding credit values. Therefore, we conclude McKee should be limited to recovering the 185 credits worth $1.85 that the parties agree the displayed reels amounted to, rather than the additional $41,797,550.16 that did not correspond to the displayed reels or the paytable.

McKee counters with several arguments. We will discuss each of them, but we do not believe any of them is sufficient to create a genuine issue of fact that would preclude summary judgment. First, McKee argues that her agreement was not an express contract dictated by the rules of the game, but simply an implied one that she would get whatever the machine said she would get. McKee cites no authority for this theory, and as noted above, it is contrary to precedent and general contract principles.

Alternatively, McKee insists the "legacy bonus" is separate and apart from the Miss Kitty game, and that she had both an express agreement (the game) and an implied agreement (the bonus) with the casino. However, even assuming McKee could have had both an express agreement and an implied agreement with the casino at the same time, *cf. Scott,* 653 N.W.2d at 562, she fails to explain the derivation of the

latter agreement. McKee had no understanding—implied or otherwise—that she might be eligible for legacy bonuses if she played at the casino, and she points to nothing that could have created an expectation in any patron that he or she might receive such a bonus. At most, the casino, through the machine, made a statement that McKee was going to receive a bonus, which it was entitled to withdraw so long as that statement was not part of a binding contract.

McKee also maintains there is a fact issue whether the machine malfunctioned or not. Therefore, McKee continues, a trial needs to occur on whether the casino can avoid liability based upon the sign on the machine and the statement in the game rules that "MALFUNCTION VOIDS ALL PAYS AND PLAYS." However, we agree with the district court's rule 1.904(2) ruling that the existence or not of a mechanical malfunction is beside the point. It is only necessary to reach the malfunction defense if McKee otherwise could receive an award under the terms of the contract. Hypothetically, *if* the casino declined to pay an award that was otherwise payable based on the alignment of the symbols, the casino would then have to establish that the slot machine had a technical malfunction in order to avoid paying the award. *See, e.g., Sengel v. IGT*, 2 P.3d 258, 262–63 (Nev. 2000) (upholding the gaming control board's denial of a jackpot to the plaintiff after a slot machine's reels stopped in a jackpot alignment due to a malfunction). However, when the machine, as here, generates an award that is not within the rules of the game, isolating the cause of what happened is not necessary. It is sufficient for present purposes that the award was erroneous in the sense that it was not a part of the game.

Along related lines, McKee maintains that the casino has failed to establish a mistake as a matter of law. Mistake, however, is a defense to

be raised when a party wants to avoid the effect of the actual contract terms. *See Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 108–09 (Iowa 2011) ("Where there has been a mistake, whether mutual or unilateral, in the expression of the contract, reformation is the proper remedy."). The casino does not need to rely on a mistake defense because it is *following* the contract terms, not seeking to avoid them.

On point is a decision of the Michigan Court of Appeals. *See Coleman v. State*, 258 N.W.2d 84, 87 (Mich. Ct. App. 1977). In *Coleman*, the plaintiff was erroneously announced as the winner of a $200,000 lottery prize. *Id.* at 86. Although the district court had found for the plaintiff, the court of appeals reversed and rejected the plaintiff's claim as a matter of law. *Id.* at 87. The appellate court reasoned,

> A lottery winner's entitlement to a prize is governed by the principles of contract law. In the instant case the bureau made a public offer that the purchaser of a lottery ticket would have a chance of winning a prize according to the advertised rules and procedures of the lottery. In purchasing her ticket Mrs. Coleman accepted that offer and agreed to the announced rules for determining prize winners.

*Id.* at 86 (citations omitted). The court further commented,

> In granting judgment for Mrs. Coleman, the lower court relied upon general principles of contract law pertaining to unilateral mistake and recision. The original contract between Mrs. Coleman and the bureau, however, was clear and unambiguous and there was no mistake as to its terms. The body of contract law relating to unilateral mistake and recision, therefore, is not applicable unless it can be established that a new contract was created between the bureau and Mrs. Coleman as a result of the erroneous award. . . .
>
>     . . . In this case, the bureau did not impose additional conditions but only enforced the previously announced rules for the drawing.

*Id.* at 86–87; s*ee also Sargent,* 840 N.Y.S.2d at 103–04 (finding the rules of the game governed rather than an erroneous notification that the plaintiff had won a prize).

McKee further criticizes the casino for failing to heed the slot machine manufacturer's warnings by continuing to use the Miss Kitty machine without affirmatively disabling the legacy bonus capability. However, this is a tort theory, rather than a contract one. From a contract law perspective, what matters is whether some express or implied agreement gave McKee a right to a bonus, not whether the casino may have been negligent.[2]

**B. Estoppel.** McKee claims the trial court erred in granting summary judgment to the casino on her equitable and promissory estoppel causes of action, as well as in failing to consider equitable estoppel as a defense.

Equitable estoppel requires McKee to prove the following elements:

> (1) The defendant has made a false representation or has concealed material facts; (2) the plaintiff lacks knowledge of the true facts; (3) the defendant intended

---

[2]As an additional defense, the casino argues that the $41,797,550.16 bonus was invalid because it was far above the maximum award the IRGC had authorized for the game. *See* Iowa Code § 537A.4 (stating gambling contracts are void except for those authorized by statute, including under chapter 99F); *id.* § 99F.4 (conferring regulatory and supervisory jurisdiction over all gambling contracts to the IRGC); Iowa Admin. Code r. 491—11.4(3) (requiring submission of game rules to the IRGC in advance); *id.* r. 491—11.4(5) (stating all gambling games are required to "operate and play in accordance with the representation made to the [Iowa Racing and Gaming C]ommission and the public at all times").

In *Blackford,* we stated, "The freedom to contract [for gambling under chapter 99F] is not, however, unlimited. When a contract addresses an area of law regulated by a statute, the statutory provisions and restrictions are a part of the parties' contract." 778 N.W.2d at 189. Here, the IRGC confirmed after the fact that the maximum award for the game, including any potential bonus, was $10,000. However, because we uphold the district court's summary judgment based on traditional contract principles, we need not reach the casino's additional argument that a $41 million bonus would have been illegal under regulatory provisions incorporated into the parties' contract.

the plaintiff to act upon such representations; and (4) the plaintiff did in fact rely upon such representations to his prejudice.

*Sioux Pharm, Inc. v. Summit Nutritionals Int'l, Inc.*, 859 N.W.2d 182, 191 (Iowa 2015) (internal quotation marks omitted).

The doctrine of equitable estoppel is a common law doctrine preventing one party who has made certain representations from taking unfair advantage of another when the party making the representations changes its position to the prejudice of the party who relied upon the representations.

*ABC Disposal Sys., Inc. v. Dep't of Natural Res.*, 681 N.W.2d 596, 606 (Iowa 2004).

Here, there is no evidence the casino made a representation on which McKee relied to her prejudice. *See Sioux Pharm, Inc.*, 859 N.W.2d at 191 ("Because Sioux Pharm did not rely on Summit's website statement, it cannot prove equitable estoppel . . . ."). Until the "Bonus Award" message appeared on the screen, McKee had received no information about a bonus and therefore could not have played the game in reliance on the possibility of a bonus. Nor is there evidence that McKee prejudicially relied on the machine's display of a $41 million "Bonus Award" to pursue any subsequent course of action.

McKee's claim of promissory estoppel fails for similar reasons. "The theory of promissory estoppel allows individuals to be held liable for their promises despite an absence of the consideration typically found in a contract." *Schoff v. Combine Ins. Co. of Am.*, 604 N.W.2d 43, 48 (Iowa 1999). Promissory estoppel requires a party to prove "(1) a clear and definite oral agreement; (2) proof that plaintiff acted to his detriment in reliance thereon; and (3) a finding that the equities entitle the plaintiff to this relief." *Id.* (internal quotation marks omitted). Again, McKee has no evidence of detrimental reliance. *See, e.g., Merrifield v. Troutner*, 269

N.W.2d 136, 138 (Iowa 1978) ("Edgar cannot rely on promissory estoppel because he has not shown he relied to his detriment upon any promise made by Claudia.").

In *Miller*, the Sixth Circuit rejected the casino patron's promissory estoppel claim under comparable circumstances. *See* 93 F. App'x at 851. The patron in *Miller* had played a slot machine that did not register a winning series of symbols. *Id.* at 849. Miller claimed, however, that the lights and sounds of the machine indicated a jackpot win. *Id.* The court determined the casino should not be estopped from denying payment to Miller. The court reasoned, "There is no evidence, however, that [the defendant gaming machine operator] made a promise to pay a primary progressive jackpot when a player did not win pursuant to the clearly posted rules of the game." *Id.* at 851.

Likewise, in this case, the rules and paytable of the Miss Kitty game listed all the winning combinations of reels and did not include the possibility of additional bonus wins. The only possible representation of a bonus, i.e., the "Bonus Award" message, did not induce detrimental reliance on McKee's part. The district court therefore properly granted summary judgment to the casino on McKee's estoppel claims.

**C. Consumer Fraud.** Chapter 714H is the Private Right of Action for Consumer Frauds Act. *See* Iowa Code § 714H.1. It prohibits certain unfair and fraudulent acts:

> A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise . . . .

*Id.* § 714H.3(1). The act establishes a private right of action: "A consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act . . . may bring an action at law to recover actual damages." *Id.* § 714H.5(1).

We agree with the district court that McKee cannot show "an ascertainable loss of money or property." *See id.* McKee's consumer fraud claim rises or falls with her breach of contract claim. If McKee had no contractual right to the bonus, and we have already determined she did not, then she could not have suffered an ascertainable loss of money or property when she was denied that bonus. This is analogous to the situation in *Blackford*, where we held the plaintiff's lack of a contractual right to a jackpot foreclosed his conversion claim. *See* 778 N.W.2d at 190. In addition, McKee made money on her gambling that evening, so she had no out-of-pocket loss.

McKee cites a decision of the Missouri Court of Appeals that reversed the dismissal of a casino patron's consumer fraud claim. *See Raster v. Ameristar Casinos, Inc.*, 280 S.W.3d 120, 131 (Mo. Ct. App. 2009). In *Raster*, the casino made changes to its compensation program, which was like a frequent-flyer program and rewarded customers based on their overall gaming volume. *See id.* at 123. These changes included restructuring the point-award formulas so it was more difficult to earn certain awards or achieve elite status. *Id.* at 123–24. The casino sent a letter to its program members, including the plaintiffs, indicating that "[n]othing really has changed" despite the new formulas and policies. *Id.* at 124 (internal quotation marks omitted). The plaintiffs thought otherwise and brought claims under that state's consumer fraud act which, much like Iowa's, required the plaintiffs to have suffered an "ascertainable loss" due to an unfair act "in connection with the sale or

advertisement of any merchandise." *Id.* at 128 (internal quotation marks omitted). The appellate court concluded that the claims should go forward. *Id.* at 131.

We find *Raster* distinguishable. This is not a situation as in *Raster* where the casino changed the rules of the game after the plaintiffs had spent money and accumulated points, which were now devalued by the casino's rule changes. *See id.* at 123–24. Rather, in this case, the rules of the game did not provide for the bonus in question and McKee therefore did not suffer an "ascertainable loss" when the casino refused to pay it. *See* Iowa Code § 714H.5(1).

**V. Conclusion.**

For the foregoing reasons, we affirm the district court's grant of summary judgment.

**AFFIRMED.**