# IN THE COURT OF APPEALS OF IOWA

No. 25-0619
Filed April 1, 2026

**Silas Vincent Goma,**
Plaintiff–Appellant,

v.

**Lindsay Elizabeth Hundley,**
Defendant–Appellee.

Appeal from the Iowa District Court for Scott County,
The Honorable Henry W. Latham II, Judge.

**AFFIRMED**

Silas Vincent Goma, Thousand Oaks, California, self-represented appellant.

Ryan M. Beckenbaugh of Beckenbaugh Law P.C., Davenport, attorney for appellee.

Considered without oral argument
by Greer, P.J., and Schumacher and Chicchelly, JJ.
Opinion by Schumacher, J.

**SCHUMACHER, Judge.**

Silas Goma appeals the district court's order placing the parties' child, S.G., in the sole legal custody of the mother, Lindsay Hundley. Silas challenges the court's determinations regarding legal custody, visitation, and attorney fees. He also raises a myriad of other claims relating to judicial bias, race, gender, religion, public policy, and constitutional protections. Upon our review, we affirm.

## I. Background Facts and Proceedings

Silas and Lindsay began dating in early 2021 when they both lived in California. That summer, Lindsay learned she was pregnant. The couple discussed their future. Silas was concerned he would lose his housing with his mother and sister. Lindsay, a registered nurse and certified lactation consultant, suggested Silas could find work in Iowa if they moved to her home state. Silas is educated in manufacturing systems engineering and describes himself as "a rocket scientist but an engineer by trade." Silas decided that Iowa was "not an option" for him. Lindsay eventually determined that Silas's schedule and family circumstances did not allow him to be available to help support their child or be in a relationship. They broke up, and Lindsay made the "hard decision" to move back to Iowa where she had a support system.

Lindsay kept Silas updated about her pregnancy, but Silas stated he "did not want to be involved." He refused to participate in carrier screening to determine potential genetic issues for the child because he was concerned Lindsay was "trying to collect his health history." Meanwhile, Silas filed a petition in California for paternity and "child abduction," which he dismissed several months later.

S.G. was born in April 2022.[1] Silas was not present for the child's birth, but he came to Iowa a few days later. Silas visited S.G. several times during that visit. Later that month, Silas initiated this proceeding to establish paternity, custody, physical care, visitation, and child support.

The parties established a schedule for Silas to have video contact with S.G., and Silas visited S.G. when he traveled to Iowa, which was mainly for court hearings. However, Silas complained about the video contact, claiming that Lindsay was unsupportive and "distracting" to S.G. while he talked to her. Lindsay explained that she only assisted S.G. when the child became fussy or cried, which Silas did not dispute. During another video visitation, Silas probed Lindsay when he noticed a bruise near S.G.'s eye, disbelieving Lindsay's explanation that the child "bumped her head on the crib." Silas then contacted the Iowa Department of Health and Human Services about the bruise, and when the department declined to investigate, he called law enforcement for a welfare check, which traumatized S.G. Silas also sent a message to S.G.'s pediatrician requesting "a full neurological assessment" for the child.

Silas sent a barrage of other messages to medical providers, including a request "for a psychological evaluation" for S.G. when she was less than one year old. In another message, Silas asked medical providers why the child "does not respond to me when I ask her something or call her name," yet he acknowledged that he called S.G. by her middle name, which the child did not recognize. After S.G. tested positive for strep throat, Silas accused

---

[1] Lindsay texted Silas and his mother and sister to alert them when she went into labor. Silas's mother didn't respond, reasoning, "What can I do? I'm 2,000 miles away. Why was she telling me this?" Silas's sister had blocked Lindsay's number, so she didn't receive the message.

Lindsay of "dodging his question" when she responded that she couldn't "pinpoint how [S.G.] got it," and then he questioned medical providers about it. Silas attended S.G.'s first well-child visit via video call, during which a "[d]isagreement" between the parties made the appointment last much longer than scheduled.

The district court entered an order on temporary matters in May 2024, placing temporary sole legal custody with Lindsay, noting in part Silas's "very paranoid outlook regarding the child's medical condition." The court further determined Silas's proposal to have S.G. reside with each parent six months out of the year "is not feasible or in accordance with the past parenting practices of the parties." The court found Silas "is simply not able to provide meaningful input concerning major issues at this time."

Trial took place in January 2025. The parties agreed the child should be placed in Lindsay's physical care. The parties disputed whether Lindsay should receive sole legal custody (as she requested) or whether joint legal custody should be ordered (as Silas requested). They also disputed an appropriate "phased" visitation schedule for Silas. The court received numerous exhibits and heard testimony from the parties as well as Silas's mother and sister.

The court issued its ruling, ordering sole legal custody with Lindsay and visitation for Silas as set forth in specific visitation provisions. The court established Silas's child support obligation and ordered him to pay $5,000 toward Lindsay's outstanding attorney fees. Silas filed a motion for reconsideration, which the court interpreted as a motion pursuant to Iowa Rule of Civil Procedure 1.904(2) and denied.

Silas appeals, challenging the determinations regarding legal custody, visitation, and attorney fees. He also raises a myriad of other claims relating to race, gender, public policy, and constitutional protections. We conduct a de novo review of the claims that are properly before us. *See Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020).

## II.    Legal Custody

"Legal custody" grants parents certain rights and responsibilities, including but not limited to "decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(5) (2022). The Iowa Code and our case law set forth a list of non-exclusive factors to guide custody decisions. *Id.* § 598.41(3); *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) (listing overlapping considerations for evaluating legal custody and physical care); *see also* Iowa Code § 600B.40 (applying the same factors to custody determinations of unmarried parents).

"A parent seeking sole legal custody must provide clear and convincing evidence that joint legal custody is unreasonable and not in the child's best interest, to the extent that the legal relationship between the other parent and child should be severed." *In re Marriage of Hammermeister*, No. 25-0354, 2025 WL 3471124, at *4 (Iowa Ct. App. Dec. 3, 2025) (citing Iowa Code § 508.41(2)(b)). "In all decisions regarding a child's legal custody and physical care, the court's polestar is the child's best interest." *Id.* Here, the district court found as follows:

> Both parents clearly love S.G. She is lucky to be here. Each of the parents can have the ability to add to her growth and maturity as she grows up. The Court finds that it was a difficult decision for Lindsay to leave the state of California, but it was clear due to the conflict that she was having with Silas that she did not have any other support system in which she

5

could rely on and she was a young woman expecting a child. It was not something Lindsay had planned. She returned to the place where she had the resources and support necessary to provide care for not only herself but the child that was about to be born.

The Court has reviewed the text messages and finds it noteworthy that Silas's actions in the past were clearly not appropriate and the Court does not find them to be appropriate. The Court appreciates that Silas came to Court on the last day of trial and admitted that his actions in the past were clearly not appropriate. Oftentimes the Court could see screenshots from Lindsay reaffirming what had already been discussed and communicated in the past not only by herself but also from Silas when she was confronted with more conflicting information. It is very difficult to co-parent with that type of communication, and it is not healthy for the minor child.

The Court also finds the situation regarding the [sic] S.G.'s name to be very concerning. It was clear that Lindsay was taking some direction from Silas regarding the minor child's name. S.G. is a very young child, her brain is developing, and she is trying to identify who she is. She is learning from her mom and dad. She needs to know who she is. Yes, the name used by Silas may be her middle name, but that was not a good decision to be calling her by a different name. Even if there is a nickname, that usually comes later when the child knows what their real name is and can identify as such. Clearly, it was not in S.G.'s best interest for Silas to call her by her middle name and the Court makes that finding.

The Court also finds that it was not in S.G.'s best interest when there are questions regarding her medical care. The Court finds Lindsay very credible. Lindsay is educated in the medical field. She has the ability to make good decisions on behalf of the child. Silas should feel fortunate that his daughter has a mother that has the ability to understand her medical needs and be able to communicate them to him. Many parents do not have that in their lives, and that is a true benefit.

The Court finds that Lindsay and Silas cannot communicate effectively for the best interests of S.G. It's clear to the Court, and the Court finds, that Lindsay has tried many times to communicate not only with Silas but also with his family. Lindsay has made efforts to be inclusive of not only S.G.'s father, but also her grandmother and her aunt; to include them in what is going on with her life. The Court makes the finding that,

unfortunately, Silas' family is not willing to reciprocate and that is not in S.G.'s best interest. The Court finds that the testimony of Silas' mother was not credible whatsoever, which is unfortunate. It appears to the Court that she is a very religious woman, but it is clear that she lied to the Court.

While the Court understands that [video] contact is not the most opportune, the Court was troubled at some of Silas' [video] interactions with S.G. as an infant. The Court understands that the parties are very religious individuals, however the Court finds that the Bible verses that were read to the child were very inappropriate. The Court has young children, and grew up in a Church. The Court has an understanding as to what young children learn in a religious education, and the verses read by Silas are inappropriate for a child. There are books that are child appropriate, and that is what Silas should be using if he wishes to do [sic] introduce appropriate bible stories or verses. The Court does not believe Lindsay would have any objection to that.

The Court further finds none of Lindsay's actions were inappropriate during the [video visits]. It is clear from the exhibits submitted that Lindsay was doing everything she could to keep out of the camera's angle. She was trying to redirect S.G. She was trying to enhance the [video] contact between Silas and S.G.

. . . .

Based on the aforementioned findings, the evidence presented, and the law, the Court finds that Lindsay's request for sole legal custody is appropriate. Lindsay is awarded sole legal custody of S.G. It is appropriate to award Lindsay sole legal custody based on the distance between the parents. It is necessary, and in S.G.'s best interests, for Lindsay to make decisions as to her medical care, education, and religious upbringing. The Court makes this finding also based upon the inability of Silas and Lindsay to effectively communicate regarding S.G.'s best interests in those areas as she develops into a young lady and adult. The Court does [sic] make this finding lightly, but the Court finds it is necessary. The testimony has been credible that the relationship and interactions between Silas and S.G. have been better since [the] temporary custody order. The Court specifically finds that the request for shared care and joint legal custody is denied based upon the findings and the law.

7

We concur with the district court's conclusion that the foregoing clearly and convincingly shows that joint custody is unreasonable and not in S.G.'s best interests. *See* Iowa Code § 508.41(2)(b). In reaching this determination, we have considered the district court's credibility determinations and afforded them deference. *See Higdon v. Rana*, No. 23-1107, 2024 WL 4370048, at *7 (Iowa Ct. App. Oct. 2, 2024) (noting "the district court had a front-row seat to the live testimony, whereas we are limited to a cold record"). Ultimately, we agree "that this is one of the rare cases where sole legal custody is appropriate and in the best interests of the child[]."[2] *In re Marriage of Gensley*, 777 N.W.2d 705, 717 (Iowa Ct. App. 2009). We affirm the award of sole legal custody.

## III. Visitation

Silas challenges the visitation schedule ordered by the court. When a court grants physical care to one parent, it should provide liberal visitation to the other parent to "assure the child the opportunity for the maximum continuing physical and emotional contact with both parents." Iowa Code § 598.41(1)(a). The visitation schedule must serve the child's best interests. *Gensley*, 777 N.W.2d at 718.

Here, the district court set forth the following summer visitation provision:

> Summer Visitation: Unless otherwise agreed to by the parties, Silas is ordered summer visitation as set forth herein. During 2025, Silas shall be awarded summer visitation for a period of seven days in Iowa. During 2026, Silas shall be awarded summer visitation for a period of fourteen days in Iowa. The specific dates for 2025 and 2026 shall be coordinated

---

[2] In reaching this conclusion, we have considered Silas's claim that Lindsay's conduct "alienated" him and "obstruct[ed]" him from having contact with the child. The record evidence does not support his contention.

between the parties, and Silas shall provide at least 30 days' notice of his intended visitation time with S.G.

During 2027, Silas shall be awarded fourteen days of summer visitation with the minor child, and said summer visitation can occur in California. During 2028, Silas shall be awarded twenty-one days of summer visitation with the minor child, and said summer visitation can occur in California. During 2029 and thereafter, Silas shall be awarded twenty-eight days of summer visitation with the minor child, and said summer visitation can occur in California.

Lindsay shall be responsible for transporting the minor child to California for the summer visitation commencing in 2027. Silas shall be responsible for returning the minor child to Lindsay's home at the conclusion of the summer visitation set forth herein. Neither party shall book any airline tickets until the parties have jointly agreed upon the date and times for travel. Said period of summer visitation shall not commence during the minor child's first week following the release from school or during the week prior to the minor child's return to school.

The court also awarded visitation to Silas for spring break, every other year, commencing in 2027. As for Christmas visitation, the court ordered: "Commencing in 2025, Silas shall be awarded visitation with the minor child for one week during the minor child's Christmas break. During 2025 and 2026, said visitation shall occur in Iowa. Commencing in 2027 and thereafter, the Christmas visitation may occur in California."

Silas claims the court "impos[ed] a punitive and drastically limited visitation schedule without any finding of harm." However, there is no evidence in the record to support Silas's claim that the court based the visitation schedule "on its personal disapproval of [Silas] calling the child by her middle name and reading her Bible verses." There is also no evidence the court "rel[ied] on its own parenting preferences and biases" in setting the

visitation schedule. We also observe the court awarded Silas two weeks of visitation in 2025, rather than one week as he alleges.[3]

Before trial, Lindsay filed a proposed visitation schedule, in which she suggested visits to California for S.G. beginning in 2025. However, after hearing the testimony of Silas's mother and sister during trial, Lindsay testified that she was concerned about "what they are going to say to her when she is there" and "if she is going to be diagnosed with something, if she is going to be taken to a doctor or psychiatrist."[4] Lindsay explained that S.G. was not old enough to be able to communicate what happens during visits, and Lindsay requested that Silas's visits take place in Iowa for a couple years, believing such arrangement was "necessary to enable [S.G.] to self-protect." In contrast, Silas requested eight weeks of visitation in summer 2026 and six weeks of visitation for Christmas 2026. Lindsay maintains that Silas's request was "a significant change from anything Silas has ever exercised, despite Lindsay's urging [for him] to visit S.G. more."

---

[3] In any event, "[t]hat small window of time . . . has come and gone and is now moot." *See Lynch v. Moreno*, No. 21-0815, 2022 WL 1486185, at *8 (Iowa Ct. App. May 11, 2022).

[4] We concur with Lindsay's concerns that Silas previously reported "he had a psychiatrist or a therapist set up in California to see [S.G.]" We also note concerns that Silas requested that S.G. spend extended periods of time in California before he established a relationship with her, which Lindsay believed "would have been stressful" and "unfamiliar for [S.G.]"; Silas's actions have shown he is influenced by his mother, even to the detriment of his relationship with S.G.; and that Silas used a "scientific method" and a flow chart for making decisions, which may not be realistic for parenting a young child.

Overall, we find the visitation schedule serves the best interests of S.G. and allows her to have time with each parent.[5] The graduated minimums are reasonable under these circumstances, and the parties can exceed those minimums upon their agreement. *See Lynch*, 2022 WL 1486185, at \*8. We affirm on this issue.

## IV. Claims relating to Judicial Bias, Race, Gender, Religion, Public Policy, and Constitutional Protections

At trial, the parties agreed Lindsay should have physical care of S.G. The issues in dispute were whether Lindsay would have sole legal custody, Silas's visitation schedule, and some financial matters. Although Silas agreed during his testimony that "we have got hundreds and hundreds of pages of exhibits," none of the evidence or testimony presented before the court related to judicial bias, gender, race, public policy, or constitutional claims. And we observe the parties were generally in agreement regarding the child's participation in religion.

Less than a week after the court entered the custody decree, Silas filed a pro se motion "for reconsideration for Disreguarding Iowa Law, the U.S. Supreme Court, Science; Promoting Sexism and Racism." He filed the motion in two parts, to which he attached more than 200 pages of literature, reports, and articles—none of which were introduced at trial. The district court interpreted Silas's filing as a motion pursuant to Iowa Rule of Civil Procedure 1.904(2), and denied it, stating:

> The Petitioner desires the Court to consider evidence which was not
> presented during the course of the trial in this matter. That request is

---

[5] In reaching this conclusion, we have considered and are not persuaded by Silas's claim that the visitation schedule ordered by the court equates to a "judicially imposed barrier to the father-daughter relationship."

improper and the Court will not consider any matters which were not presented during the course of the trial. The Court can only consider errors of fact or law on the evidence presented. The Court based its findings on the necessary facts noted in its ruling. The Court could have exhaustively listed additional facts as noted by the Respondent, but the Court relies on the official record to further support the Court's findings.

The Petitioner fails to provide any basis for the Court to modify or change the ruling made. The Court will not respond to the unsupported allegations made by the Petitioner in his pleadings. The Petitioner's pleadings further support the fact the Court made the correct decision in the best interests of the child in this matter to place her in the sole legal custody of the Respondent. It is unfortunate the Petitioner is unable to focus on the time he has with his daughter to establish a positive parental relationship with his daughter.

As the Petitioner has failed to provide any legal or appropriate basis to grant his request. [sic] The Petitioner's Motion for new trial or amended ruling is DENIED.

On appeal, Silas revisits the claims made in his motion for reconsideration. He also adds additional challenges. Lindsay maintains we should not consider Silas's claims "because they were not raised or developed <u>at all</u> at trial (not to mention the utter lack of any evidence whatsoever of any racial or gender bias on behalf of the trial court)." Specifically, interspersed throughout Silas's brief on appeal are the following claims:

- "The [district] court abused its discretion by upholding its unconstitutional order and creating harmful precedent for Iowa families";

- "The district court abused its discretion by denying a new trial and refusing to consider critical evidence on the developmental harm caused by its order";

- "The district court's best-interest analysis was fatally flawed because it wholly ignored the child's needs as a biracial child";

- "The district court's failure to consider S.G.'s biracial identity was a reversible legal error that produced an unconstitutional, racially discriminatory outcome";

- "The district court abused its discretion and violated [Silas's] constitutional rights by relying on baseless credibility findings and impermissible gender and racial bias";

- "The district court's custody order violates Iowa's statutory and constitutional mandates by severing the father-child bond without a finding of harm";

- "The [district court's] custody [order] errs by punishing a fit parent in violation of statute and the due process and equal protection clauses";

- "The district court wholly overlooked *Troxel v. Granville*, [530 U.S. 57 (2000) (reaffirming the fundamental right of parents to direct the upbringing of their children without state interference), by] denying [Silas] his fundamental constitutional right to parent";

- "The district court violated [Silas's] fundamental constitutional rights by substituting its judgment for that of a fit parent and relying on impermissible bias";

- "The district court abused its discretion by denying a new trial and refusing to correct manifest errors of law and fact that create harmful public policy";

- "The district court violated [Silas's] due process rights by misapplying custody statutes to punish a fit parent and reward manufactured conflict";

- "The district court legally erred by misapplying the [*In re Marriage of*] *Hansen*[, 733 N.W.2d 683, 697–99 (Iowa 2007)] factors, violating fundamental constitutional rights, and abusing its discretion in denying a new trial";

- "The district court violated the First Amendment by prohibiting [Silas's] religious speech without the required finding of substantial harm"; and

- "The [district] court abused its discretion through a biased application of law and by refusing to consider evidence crucial to the child's best interests."

"Generally speaking, a party cannot use a rule 1.904(2) motion to introduce new evidence." *McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 525 (Iowa 2015). "Motions under [rule 1.904(2)] are permitted so that courts may enlarge or modify findings based on evidence already in the record. They are not vehicles for parties to retry issues based on new facts." *In re Marriage of Bolick*, 539 N.W.2d 357, 361 (Iowa 1995).

We have reviewed the transcript and record in its entirety. None of these claims were raised until either after trial or for the first time on appeal. Silas "had ample opportunity at trial to offer testimony [and evidence] in support of his argument. He merely failed to take advantage of the opportunity." *Id.* "[W]hen a party has presented an issue, claim, or legal theory and the district court has failed to rule on it, a rule 1.904(2) motion is proper means by which to preserve error and request a ruling from the district court." *Homan v. Branstad*, 887 N.W.2d 153, 161 (Iowa 2016); *Bridge Gap Eng'g, LLC v. Am. Pfeiffer Corp.*, No. 21-1966, 2022 WL 3053290, at *5 (Iowa Ct. App. Aug. 3, 2022) (reversing the district court's denial of a rule 1.904(2) motion upon finding the challenged liquidated-damages provision "was not new evidence" because it was part of the contract admitted into evidence that "underlies the dispute").

But that is not what happened here. The district court did not abuse its discretion in refusing Silas's request to consider new claims and evidence post-trial. *Bolick*, 539 N.W.2d at 361; *see generally Winger Contracting Co. v. Cargill, Inc.*, 926 N.W.2d 526, 534 (Iowa 2019) (noting the district court rejected the argument that "new issues and new evidence may be introduced" to support a rule 1.904(2) motion).

We therefore affirm the district court's order denying Silas's rule 1.904(2) motion. And because Silas's additional claims on appeal were

neither raised before nor addressed by the district court, they are not preserved for our review. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). Even if he had preserved his claims, we find them unpersuasive and discern no bias by the district court.

## V.     Trial Attorney Fees

Silas also challenges the portion of the order that he pay $5,000 toward Lindsay's trial attorney fees. The court may award attorney fees to a prevailing party in a proceeding under Iowa Code chapter 600B. Iowa Code § 600B.26. We review such an award for an abuse of discretion. *See Markey v. Carney*, 705 N.W.2d 13, 25 (Iowa 2005); *Welch v. Schuler*, No. 24-1777, 2025 WL 2408586, at *5 (Iowa Ct. App. Aug. 20, 2025). An award of attorney's fees is based on the parties' respective needs and ability to pay. *Markey*, 705 N.W.2d at 26.

Lindsay requested $10,000 in trial attorney fees. The district court did "not find that amount is appropriate, but . . . based upon the evidence presented and the disparity in income that the amount of $5,000.00 is reasonable." Indeed, Lindsay testified her income in 2024 was $62,656.23, and Silas testified his income in 2024 was $104,589.32. Silas represented himself through much of the proceedings, and his numerous filings and requests increased Lindsay's fees. And Silas acknowledged he "provided the Court with a bunch of exhibits," which Lindsay's attorney was required to review. Lindsay also testified she incurred $3,500 in fees to defend an action Silas filed against her in California. Upon our review, we find the district court's award to be consistent with Lindsay's need and Silas's ability to pay. Accordingly, we affirm.

## VI. Appellate Attorney Fees

Lindsay requests an award of $9,560 in appellate attorney fees. "Appellate attorney fees are not a matter of right but may be awarded as a matter of discretion." *Hensch v. Mysak*, 902 N.W.2d 822, 827 (Iowa Ct. App. 2017). When considering whether to award appellate attorney fees, we consider "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal." *Id.*

Before addressing the specific fee request, we highlight issues with Silas's brief. Much of his briefing cites to material not introduced at trial. We also note what Lindsay frames are "intentional miscites to the record." And Silas's brief contains cites to cases that either do not exist in Iowa or do not contain the holdings for which Silas has cited. So, we again stress that self-represented litigants and attorneys alike have a duty to independently verify the authenticity and veracity of all sources and assertions when preparing appellate court filings. *Luke v. Dep't of Health & Hum. Servs.*, No. 24-1421, 2025 WL 2237311, at *1 (Iowa Ct. App. Aug. 6, 2025). "Although a pro se litigant is not subject to the same ethical duties as an attorney, we expect attorneys and pro se litigants to 'all . . . act with equal competence.'" *Turner v. Garrels*, No. 24-0895, 2025 WL 2537738, at *1 n.1 (Iowa Ct. App. Sept. 4, 2025) (ellipsis in original) (quoting *Kubik v. Burk*, 540 N.W.2d 60, 63 (Iowa Ct. App. 1995)).

When considering the needs of Lindsay relative to appellate attorney fees, the ability of Silas to pay, and Lindsay's obligation to defend the district court's decision, we grant Lindsay's request and order Silas to pay Lindsay's appellate attorney fees in the amount of $9,560.

## VII. Conclusion

Having addressed the issues properly before us, we affirm the district court's decision to place the child in Lindsay's sole legal custody, the visitation plan ordered by the court, and the award of trial attorney fees to Lindsay. We award Lindsay appellate attorney fees in the amount of $9,560. Costs on appeal are assessed to Silas.

**AFFIRMED.**